**ANTONIA M. APPS**
**REGIONAL DIRECTOR**
**Sheldon L. Pollock**
**Judith A. Weinstock**
**Christopher M. Colorado**
**Suzanne M. Bettis**
**Heather Marshall Molavi**
**Attorneys for Plaintiff**
**SECURITIES AND EXCHANGE COMMISSION**
**New York Regional Office**
**100 Pearl Street, Suite 20-100**
**New York, NY 10004-2616**
**212-336-9143 (Colorado)**
**ColoradoCh@sec.gov**

**UNITED STATES DISTRICT COURT**
**EASTERN DISTRICT OF NEW YORK**

|  |  |
|---|---|
| **SECURITIES AND EXCHANGE COMMISSION,** | <u>**COMPLAINT**</u> |
| **Plaintiff,** | 1:24-cv-06405 |
| **-against-** | JURY TRIAL DEMANDED |
| **MARG PATEL, ROBERT HOROWITZ, and CHINTANKUMAR BHATT,** | |
| **Defendants.** | |

Plaintiff Securities and Exchange Commission ("SEC"), for its Complaint against Defendants Marg Patel ("Patel"), Robert Horowitz ("Horowitz"), and Chintankumar Bhatt ("Bhatt") (collectively, "Defendants"), alleges as follows:

**SUMMARY**

1.       From at least February 2021 through August 2022, defendants—Patel, the former chief executive officer of Medly Health, Inc. ("Medly"), a now-defunct privately held online pharmacy company; Horowitz, Medly's former chief financial officer; and Bhatt, Medly's

former head of Rx Operations—deceived investors about Medly's business, including through

repeated false and misleading misrepresentations about Medly's growth and revenues.

2.      Medly was marketed to investors as a company that was disrupting the pharmacy

industry by providing a full-service online pharmacy experience, from the moment a doctor

wrote a prescription through delivery of the prescribed medication to the patient, that would limit

the need for brick-and-mortar locations and minimize the associated costs.  Investors were told

that Medly was succeeding wildly as the "nation's fastest-growing digital pharmacy" with

exploding revenue growth.

3.      In reality, much of Medly's revenue and revenue growth was built on fake

prescriptions and accounting irregularities.

4.      For years, Bhatt had been creating hundreds of fake prescriptions for high-dollar

medications in Medly's internal pharmacy management system resulting in millions of dollars of

accounts receivable or revenue that was not real and that Medly would never receive.

5.      At the same time, Medly restricted its U.S.-based accounting and finance

employees from that internal Medly system—including the raw data showing the fake

prescriptions and resulting fake revenue—and required those employees to outsource and rely on

analyses of that data by an India-based subsidiary, forcing the U.S.-based Medly teams to

incorporate financial information from the subsidiary that was replete with irregularities and

inaccuracies.

6.      Despite these restrictions, several Medly employees discovered problems in

Medly's financials and identified material revenue overstatements and they repeatedly notified

Patel and Horowitz of the irregularities and overstatements.

7.     Although Patel and Horowitz knew or recklessly disregarded that Medly's revenue numbers were wrong and materially overstated, they each used those inflated numbers to educate potential investors about Medly's business and, based on false and misleading financial statements, persuaded those investors to buy more than $170 million worth of Medly stock and convertible notes.

8.     By April 2022, the scheme began to unravel.  At the urging of Medly's Board of Directors (the "Board"), Horowitz was demoted and he resigned soon thereafter.  When Bhatt's fake prescriptions and Medly's other accounting issues became known by many within the company, the Board fired Patel.  Bhatt also resigned.  Medly's business quickly deteriorated and it filed for Chapter 11 bankruptcy protection in December 2022 and, in April 2023, converted that action to a Chapter 7 liquidation.  Those who had invested in Medly lost their entire investment.

## VIOLATIONS

9.     By virtue of the foregoing conduct and as alleged further herein, Patel and Horowitz violated Section 17(a) of the Securities Act of 1933 ("Securities Act") [15 U.S.C. § 77q(a)] and Section 10(b) of the Securities Exchange Act of 1934 ("Exchange Act") [15 U.S.C. § 78j(b)], and Rule 10b-5 thereunder [17 C.F.R. § 240.10b-5].

10.     By virtue of the foregoing conduct and as alleged further herein, Bhatt violated Sections 17(a)(1) and 17(a)(3) of the Securities Act [15 U.S.C. § 77q(a)(1) and (3)], and Section 10(b) of the Exchange Act [15 U.S.C. § 78j(b)] and Rules 10b-5(a) and (c) thereunder [17 C.F.R. § 240.10b-5(a) and (c)].  Bhatt further aided and abetted Patel's and Horowitz's violations of Securities Act Section 17(a)(2) [15 U.S.C. § 77q(a)(2)] and Section 10(b) of the Exchange Act [15 U.S.C. § 78j(b)] and Rule 10b-5(b) thereunder [17 C.F.R. § 240.10b-5(b)].

11.     Unless Defendants are restrained and enjoined, they will engage in the acts, practices, transactions, and courses of business set forth in this Complaint or in acts, practices, transactions, and courses of business of similar type and object.

## NATURE OF THE PROCEEDINGS AND RELIEF SOUGHT

12.     The SEC brings this action pursuant to the authority conferred upon it by Securities Act Sections 20(b) and 20(d) [15 U.S.C. §§ 77t(b), 77t(d)] and Exchange Act Section 21(d) [15 U.S.C. § 78u(d)].

13.     The SEC seeks a final judgment:  (a) permanently enjoining each Defendant from violating, directly or indirectly, Securities Act Section 17(a) and Exchange Act Section 10(b) [15 U.S.C. §§ 77q(a) and 78j(b)], and Rule 10b-5 [17 C.F.R. § 240.10b-5]; (b) ordering Defendants to disgorge all ill-gotten gains they received as a result of the violations alleged here and to pay prejudgment interest thereon, pursuant to Exchange Act Sections 21(d)(3), 21(d)(5), and 21(d)(7) [15 U.S.C. §§ 78u(d)(3), 78u(d)(5), 78u(d)(7)]; (c) ordering Defendants to pay civil money penalties pursuant to Securities Act Section 20(d) [15 U.S.C. § 77t(d)] and Exchange Act Section 21(d)(3) [15 U.S.C. § 78u(d)(3)]; (d) permanently prohibiting each Defendant from serving as an officer or director of any company that has a class of securities registered under Exchange Act Section 12 [15 U.S.C. § 78l] or that is required to file reports under Exchange Act Section 15(d) [15 U.S.C. § 78o(d)], pursuant to Securities Act Section 20(e) [15 U.S.C. § 77t(e)] and Exchange Act Section 21(d)(2) [15 U.S.C. § 78u(d)(2)]; and (e) ordering any other and further relief the Court may deem just and proper.

## JURISDICTION AND VENUE

14.     This Court has jurisdiction over this action pursuant to Securities Act Section 22(a) [15 U.S.C. § 77v(a)] and Exchange Act Section 27 [15 U.S.C. § 78aa].

15.     Defendants, directly and indirectly, have made use of the means or instrumentalities of interstate commerce or of the mails in connection with the transactions, acts, practices, and courses of business alleged herein.

16.     Venue lies in this District under Securities Act Section 22(a) [15 U.S.C. § 77v(a)] and Exchange Act Section 27 [15 U.S.C. § 78aa] because certain of the transactions, acts, practices, and courses of business alleged herein occurred within this District.  Among other things, Medly maintained its headquarters in Brooklyn, New York, where its employees, including Defendants, regularly conducted business.

**DEFENDANTS**

17.     **Patel**, age 36, is a resident of Staten Island, New York.  Patel co-founded Medly and served as its CEO until August 2022, when Medly's Board terminated him.  As CEO, Patel was responsible for Medly's operations; raising money from investors; and reviewing and approving financial information for, and providing that information to, Medly's Board and its prospective and existing investors.  Patel was also a director of Medly's India-based subsidiary, Medly Software Systems LLP.  During the SEC's investigation that preceded this action, Patel invoked his Fifth Amendment privilege against self-incrimination, refused to produce documents in response to an SEC subpoena, and refused to answer all substantive questions during sworn testimony.

18.     **Horowitz**, age 39, is a resident of Colts Neck, New Jersey.  Horowitz earned a bachelor's degree in finance and a master's degree in business administration and previously held Series 7, 63, and 65 securities representative and investment adviser licenses.  Between approximately December 2019 and April 2022, Horowitz was Medly's CFO.  In April 2022, Horowitz was demoted to a role as Medly's Executive Vice President of Finance & Accounting and remained in that position until he resigned in July 2022.  In both roles, Horowitz managed

Medly's accounting and financial planning and analysis ("FP&A") teams.  As CFO, Horowitz was also responsible for drafting, reviewing, and approving financial information for, and providing that information to, Medly's Board and its prospective and existing investors.

19.     **Bhatt**, age 38, is a resident of Monroe, New Jersey.  Between approximately January 2019 and October 2022, Bhatt was Medly's Head of Rx Operations.  Before Medly, Bhatt was a long-time associate of Patel and of Patel's family and had worked (and continues to work) at other pharmacies in which Patel has an ownership stake.  During the SEC's investigation that preceded this action, Bhatt invoked his Fifth Amendment privilege against self-incrimination, refused to produce documents in response to a SEC subpoena, and refused to answer all substantive questions during sworn testimony.

## RELEVANT ENTITIES

20.     **Medly Health, Inc. ("Medly")**, formed in 2017 and incorporated in 2018 in Delaware, had its principal place of business in Brooklyn, New York.  Medly was privately held and purported to be a "full-service digital pharmacy platform" with same-day prescription delivery.  Medly also maintained physical pharmacy locations and distribution centers.  Medly is currently in bankruptcy proceedings under Chapter 7 of the U.S. Bankruptcy Code.

21.     **Medly Software Systems LLP ("Medly Software")**, incorporated in 2019 in India, is an entity registered to do business in India and with its principal place of business in Pune, India.  Medly Software was a subsidiary of Medly.  During the relevant period, Medly Software provided accounting, financial, and data analytics services to Medly, including through Medly Software's so-called "Business Intelligence Team" or "BI Team."

22.     **Investor A** is a venture capital firm that invested more than $60 million in Medly, including more than $27 million in Medly's Series C fundraising round.  Beginning in February 2019, Investor A held a seat on Medly's Board.

23.    **Investor B** is a venture capital firm that invested approximately $5 million in Medly, including approximately $1 million in Medly's Series C fundraising round.  Beginning in March 2019, Investor B had observer rights on Medly's Board.

24.    **Investor C** is a growth equity firm that invested more than $50 million in Medly, including more than $20 million in Medly's Series C fundraising round.  Beginning in March 2020, Investor C held a seat on Medly's Board.

25.    **Investor D** is a growth equity firm that invested more than $85 million in Medly's Series C fundraising round.  Beginning in May 2021, Investor D held a seat on Medly's Board.

26.    **Investor E** is a venture capital firm that invested more than $10 million in Medly's Series C fundraising round.  Beginning in July 2021, Investor E had observer rights on Medly's Board.

27.    **Investor F** is a venture capital firm that invested more than $10 million in Medly's Series C fundraising round.

28.    **Investor G** is a venture capital firm that invested more than $7 million in Medly's Series C fundraising round.

29.    **Investor H** is a venture capital firm that invested approximately $500,000 in Medly's Series C fundraising round.

30.    **Investor I** is a growth equity firm that invested approximately $4.5 million in Medly's Series C fundraising round.

## FACTS

## I.    MEDLY WAS OPERATED BY DEFENDANTS

31.    Since before 2017, Patel and his family owned, in full or in part, several New York-based pharmacies.  Patel served on the boards of directors of some of those pharmacies.

32.     In 2017, Patel, together with his brother, founded Medly to be a full-service online pharmacy through which medical providers could submit prescriptions, patients could have those prescriptions filled, and the prescribed medications would be delivered to the patients.

33.     At its formation, Patel became Medly's CEO.  In that role, Patel oversaw and managed Medly's operations and business development and Medly's fundraising from investors, among other things.

34.     Patel and his brother initially funded Medly through $900,000 in unsecured loans, and, at that time, Patel and his brother each owned more than forty percent of Medly.

35.     Thereafter, Medly earned revenue by processing prescriptions from medical providers and their patients, maintaining an inventory of medications, using that inventory to fill prescriptions, validating patients' insurance coverage, filing claims with health insurance companies, delivering prescribed medications to patients, and obtaining payment from patients and insurance companies.

36.     Medly began significantly expanding its staff in 2018, growing from approximately 120 employees at the end of that year to more than 380 employees by the end of 2019.  During that time, Medly also expanded its physical footprint, which included both pharmacy locations and distribution centers, from New York and New Jersey to Pennsylvania.

37.     In December 2018, Medly hired a long-time associate of Patel—who had worked at multiple pharmacies associated with Patel and Patel's family—to be a Medly Vice President and its Director of Pharmacy and Compliance and, later, Medly's Chief Compliance Officer ("Medly CCO").  In those roles, the Medly CCO oversaw Medly's compliance with regulatory requirements and internal policies and procedures, including concerning insurance claims and data management.  The Medly CCO was also appointed to serve on Medly's Board.

38.     In or around January 2019, Medly hired Bhatt as the Director of Rx Operations. Later, Bhatt's title changed to Head of Rx Operations.  In those roles, Bhatt oversaw Medly's prescription business operations, including Medly's pharmacy management systems and medication inventory management.

39.     During his employment at Medly, Bhatt received options to purchase more than one million shares of Medly common stock.

40.     In December 2019, Medly hired Horowitz as its CFO.  In that role, Horowitz analyzed the financial performance of Medly's business operations and prepared financial reports and forecasts for Medly's Board and for actual and potential investors.  Horowitz also made presentations concerning Medly's financial performance to Medly's Board and to actual and potential investors, and he managed and was responsible for Medly's accounting and FP&A personnel.

41.     During his employment at Medly, Horowitz received options to purchase more than three and a half million shares of Medly common stock.

## II.     MEDLY CONDUCTED TWO INITIAL FUNDRAISING ROUNDS AND INVESTORS IN THOSE ROUNDS JOINED MEDLY'S BOARD

42.     Between March 2019 and May 2020, Medly conducted two fundraising rounds from outside sources, its Series A and Series B fundraises.

43.     In those fundraising rounds, each of which were private placements, Medly sold preferred equity shares and notes that were convertible to preferred equity shares to outside accredited investors for more than $75 million.[1]

---

[1] In general, a private placement is an offering and/or sale of securities that is exempt from the registration requirements of the federal securities laws and the Commission, including, for example, because the offering and sale is only to accredited investors, among other requirements.

44.     Investor A, Investor B, and Investor C each invested in one or both of the Series A and Series B rounds.  In connection with those investments, Investor A and Investor C each obtained Board seats and Investor B obtained Board observer rights.

45.     Based on the Series A fundraise, Medly's valuation was approximately $50 million.  As of the subsequent Series B fundraise, Medly's valuation had grown to approximately $270 million.

## III.    MEDLY CREATED FAKE PRESCRIPTIONS AND CONCEALED FALSELY INFLATED REVENUE

46.     Since at least approximately January 2020, Medly's operations and accounting were plagued with issues that resulted in its financial statements being inaccurate, including due to hundreds of fake prescriptions created by Bhatt in Medly's systems.

47.     Both Patel and Horowitz knew that Medly's revenue numbers were inaccurate, yet each used those inaccurate numbers to raise an additional more than $170 million from outside investors in Medly's subsequent Series C fundraising round.

### A.    Bhatt Created Fake Prescriptions and Medly Recognized Revenue From Them.

48.     Medly earned most, if not all, of its revenue by selling medications to fill prescriptions, either from payments from health insurance companies or patients.

49.     Medly used pharmacy management software called "PrimeRx."

50.     Through PrimeRx, Medly managed patient accounts, health insurance company details, prescriptions, medication inventory, and billing to patients and health insurance companies, among other things.

51.     Within Medly, each employee's access to and permissions within PrimeRx depended on the employee's role.  For example, some employees were permitted to view patient profiles and those patients' prescription needs, while others were not.  Similarly, some

employees were permitted to create data within and delete data from PrimeRx, while others were not.

52.     Bhatt had full administrative-level access to PrimeRx features.

53.     Starting no later than November 2020, Bhatt began creating entries in PrimeRx for prescriptions that Medly had supposedly filled but that, in truth, did not actually exist and were never filled by Medly.  These purported prescriptions—many of which were for high-dollar, specialty medications—were fake.

54.     In many instances, Bhatt entered the fake prescriptions to correspond with former Medly patients who had been marked within Medly's records as deceased.  In other instances, Bhatt entered the fake prescriptions to correspond to fake patient profiles within PrimeRx that Bhatt had also concocted and that did not belong to any actual person.

55.     In total, from at least November 2020 through July 2022, Bhatt created hundreds of fake prescriptions for high-dollar medications that Medly had supposedly (but had not actually) filled and delivered, including medications that cost more than $172,000 each.

56.     Bhatt then caused these fake prescriptions to appear as if they had been billed within PrimeRx to health insurance companies.  The billing, like the prescriptions, was fake. The companies to which the fake prescriptions had supposedly been billed either did not exist or were not health insurance companies.  For example, within PrimeRx, Bhatt created a Bank Identification Number or "BIN"—which health insurance plans use to process electronic pharmacy claims—for two health insurance companies that did not exist and then Bhatt created entries showing that the fake prescriptions had been "billed" to the BIN for these fake health insurance companies.

57.    Bhatt also regularly created and disseminated within Medly, including to Patel and Horowitz, reports showing Medly's periodic operational and financial results that included accounts receivable or revenue related to his fake prescriptions.

58.    As Bhatt knew or recklessly disregarded, these fake prescriptions and the purported payments that Medly supposedly received or was to receive related to them were incorporated into Medly's financial statements—indeed, Medly recognized millions of dollars of revenue from them.

59.    Bhatt also knew or recklessly disregarded that Medly was engaged in fundraising from investors during the time he was creating the fake prescriptions and that financial statements incorporating those fake prescriptions were provided to existing or potential Medly investors.

60.    Bhatt tried to conceal his fraudulent conduct.  He caused the majority of the fake prescriptions to be associated with Medly's three busiest pharmacy locations, where they might be less conspicuous, and typically created the fake information within PrimeRx well outside of normal working hours, when other Medly employees were less likely to see his manipulation happening.  Bhatt then regularly revised the fake information he had input into PrimeRx, including moving the fake prescriptions from one fake patient profile to another and from one BIN number to another, to attempt to keep his conduct from being discovered.

61.    Bhatt's conduct was further obfuscated by the way in which Medly performed its financial and accounting work and structured its financial and accounting teams.

62.    Medly did not give many of its own accounting and FP&A personnel, based in the United States, direct access to PrimeRx or the Medly operational and financial data maintained therein.

63. Rather, Medly required its accounting and FP&A personnel to rely on analyses of that data by an India-based subsidiary, Medly Software.

64. Within Medly Software, the analyses were done by the so-called "Business Intelligence" or "BI Team," run by a long-time business partner of Patel, that regularly coordinated with Bhatt and, unlike much of Medly's own staff, had access to PrimeRx. The BI Team revised, aggregated, and analyzed PrimeRx data and created reports concerning Medly's financial performance.

65. For example, the BI Team used PrimeRx to review prescription and sales data from Medly's individual locations and distribution centers and on a consolidated basis; and to aggregate and analyze that data to calculate Medly's sales, inventory, and cost of goods sold. The BI Team routinely overstated Medly's revenue, including because it incorporated Bhatt's fake prescriptions and due to other irregularities and inaccuracies.

66. The BI Team sent its financial reports and analyses to Medly's U.S.-based accounting and FP&A personnel who, in turn, relied on those reports and analyses—which were inaccurate—to create financial reports, statements, and forecasts for Medly's Board and existing and potential investors.

**B.  Before Medly's Series C Fundraising Round, Patel and Horowitz Knew, Or Recklessly Disregarded, that Medly's Revenue was Overstated.**

67. In late 2020, Investor C, while doing diligence related to a possible investment in Medly, expressed concerns to Patel and Horowitz about a potential accounting irregularity:  a substantial and growing debit balance in a Medly expense accrual account that was listed under Medly's Other Current Liabilities ("OCL") line item.

68.     In general, OCL reflect liabilities that a company expects to pay within one year. These liabilities are short-term in nature and are meant to include various types of liabilities that do not fall under more specific categories like accounts payable or short-term debt.

69.     An expense accrual account generally represents expenses a company has incurred but has not yet paid.  This might include, for example, salary a company owes for a particular time period but has not paid.  An expense accrual account is intended to ensure that expenses are recognized in the period in which they occur even if paid later.

70.     In accrual accounting, which Medly used, the entries in an expense accrual account are generally credits on the company's balance sheet, and not debits, because they are amounts that have been earmarked for future payment and will be removed and reduced to zero when paid.

71.     Because an expense accrual account typically reflects a credit balance consisting of the sum of expenses the company has incurred but has not yet paid, a debit balance in an expense accrual account—like that noted by Investor C to Patel and Horowitz—is unusual and can suggest an error in the financial statements.

72.     In or around November 2020, after Investor C identified the potential issue with the OCL account, Medly engaged multiple accounting firms to assist in "cleaning up" its financial statements, including reviewing and reconciling Medly's accounts and reviewing and adjusting any errors in those financial statements.

73.     Shortly thereafter, Horowitz told one of the accounting firms that he believed Medly's revenue numbers could be overstated by as much as twenty percent.

74.     That accounting firm understood from Horowitz that Medly's OCL line item was being used as a "plug," *i.e.*, a line item to record the difference between revenue Medly included

in its financial statements, on the one hand, and revenue that was actually supported by Medly's cash and accounts receivable, on the other hand.[2]  Thus, this "plug" concealed material errors in Medly's financial statements, including concerning its revenue.

75.     As discussed below, certain other personnel from Medly's accounting and FP&A teams also recognized that the OCL and expense accrual account line items (*i.e.*, the "plug")— and the substantial growth of those line items over time—were unusual and, in late 2020 and early 2021, they began to try to obtain and analyze the underlying data.  Those employees determined that the BI Team had been reporting Medly revenue in amounts that were significantly higher than Medly's actual revenue as calculated from Medly's raw data.

76.     In January 2021, a senior analyst on Medly's FP&A team ("FP&A Senior Analyst") obtained raw data from PrimeRx from another employee who had access to that system.  The FP&A Senior Analyst compared the raw PrimeRx data against the BI Team's prior financial reports and determined that the BI Team had repeatedly overstated Medly's revenue.

77.     The FP&A Senior Analyst told Horowitz about these overstatements and also that the FP&A Senior Analyst understood, based on their analysis of the BI Team's overstatements, that Medly, too, had been overstating revenue.  The FP&A Senior Analyst also told Horowitz that Medly should not fundraise based on the overstated revenue and asked Horowitz to communicate that to Patel.

---

[2] In or around December 2020, Medly reported to its Board that it had reversed approximately $1.8 million of revenue from early 2020 purportedly related to uncollected copayments.  The impact of the accounting irregularities and fake prescriptions alleged herein were exponentially larger than this reported change.

78.     In February 2021, the FP&A Senior Analyst discussed the BI Team's revenue overstatements with both Patel and Horowitz and provided Patel with a specific example of how the BI Team reports had led to incorrect revenue recognition.

79.     Horowitz then told the FP&A Senior Analyst that Patel believed the FP&A Senior Analyst had been "digging too much" into the discrepancies between the BI Team reports and Medly's raw financial data.

80.     Also in or around February 2021, Horowitz instructed a Medly senior accountant ("Senior Accountant")—who had expressed concerns to Horowitz about the accuracy of financial statements provided to Medly's Board and investors—to track internally what Medly employees believed were Medly's accurate financial numbers, including revenue, separate from the financial statements that were shown to Medly's Board.

81.     On March 2, 2021, Horowitz sent an email to both the Senior Accountant and Medly's Head of FP&A ("Head of FP&A"), expressly acknowledging "Revenue Concerns." In the email, Horowitz described his concern that Medly's revenue numbers were inaccurate, that he had discussed this concern with Patel more than six weeks earlier, and had recommended to Patel that Medly "look to restate revenues based on these find[ing]s"—that is, that Medly revise prior financial statements to correct the amount of revenue it had earned.

82.     In that same email, Horowitz wrote,

> The guidance I received from [Patel] was to stop and not alarm the team. He had requested we continue with this accounting practice until our Series C fund raise was completed. His concern was that we did not "fully understand" the impacts of our hypothesis and that we should not further "explore" or "spend effort analyzing" this potential issue until Q2 2021.

83.     In the email, Horowitz instructed the Head of FP&A and the Senior Accountant to have their teams continue to analyze Medly's revenue overstatement, although both the Head of

FP&A and the Senior Accountant believed Horowitz's email and instruction were an attempt by Horowitz to create a paper trail to avoid blame or liability if something with Medly went awry.

84.     Later in March 2021, the Senior Accountant memorialized in a writing to Horowitz several concerns the Senior Accountant had previously expressed about the way in which Medly was run, including "an apparent disregard for the integrity of our books and financial reporting" and "the reluctance to investigate and disclose a material misstatement in our revenue while fundraising."  That month, the Senior Accountant resigned.

## IV.    PATEL AND HOROWITZ RAISED FUNDS USING FALSE AND MISLEADING FINANCIAL STATEMENTS

85.     While Medly employees were uncovering and identifying significant inaccuracies in Medly's revenue, and informing Patel and Horowitz of those issues, Patel and Horowitz were marketing and then closing Medly's largest ever fundraising round, its Series C fundraise—and Patel and Horowitz were using false and misleading financial statements to do so.

86.     Medly began marketing the Series C fundraise in or around October 2020.  The Series C fundraise had two closes, the first between May 2021 and February 2022, and a second close between July and August 2022.

87.     During the first close of the Series C round, Medly sold preferred equity shares, in a private placement, to outside accredited investors for more than $164 million.

88.     During the second close of the Series C round (also referred to as the Series C-1), Medly sold additional preferred equity shares, also in a private placement, to outside accredited investors for more than $7 million.

89.     Based on the Series C round, Medly's valuation was approximately $925 million—growth of more than 240 percent from its May 2020 fundraise.

90.     Before investors participated in the Series C fundraise, Patel and Horowitz made and disseminated false and misleading statements to them about Medly's financial performance, including about revenue Medly had purportedly earned, but which it had not, in fact, earned. Patel and Horowitz each knew or recklessly disregarded that these statements were false and misleading.

**A.     Patel and Horowitz Had Critical Roles in the Series C Fundraise.**

91.     As Medly's CEO and CFO, Patel and Horowitz each had critical roles in Medly's Series C fundraise.  Each reviewed, revised, and approved financial statements and presentations for firms that were considering investments.  And each communicated directly with potential investors to answer questions about Medly and its operational and financial performance.

92.     As noted, Horowitz oversaw the Medly teams that created the financial information that was incorporated into Medly's financial statements and presentations that were presented to potential investors, and Horowitz reviewed, revised, and approved that information, including as it was incorporated into documents provided to potential investors.

93.     Patel also reviewed, revised, and approved the information provided to potential investors, including financial statements and presentations.  According to Horowitz, Patel was intimately involved in and had significant influence over the documents and information that Medly shared with those firms.

**B.     In May 2021, Medly Obtained Nearly $113 Million From Outside Investors.**

94.     On May 27, 2021, as part of the first close of its Series C fundraise, Medly raised nearly $113 million from four outside investors—Investor A, Investor B, Investor C, and Investor D.

95.     Before those investments, Patel and/or Horowitz made false and misleading statements to those four Investors, and disseminated false and misleading statements to them,

including concerning Medly's revenue.  Patel and Horowitz knew or recklessly disregarded that these statements were false and misleading.

96.     In November 2020, contemporaneous to Horowitz's statement to Medly's outside accounting firm that he believed Medly's revenue could be overstated by as much as twenty percent, *supra* paragraph 73, Horowitz sent false financial information to an investor concerning Medly's revenue.

97.     Specifically, in advance of a Medly Board meeting—and just as Medly was beginning to market its Series C fundraising round—Horowitz sent Investor C, an existing investor in Medly that had a seat on Medly's Board, a presentation concerning Medly's performance which stated that, between January and September 2020, Medly had earned more than $129 million in revenue, and that Medly had missed its revenue budget projection by only $20 million or 13 percent.  As Horowitz knew or recklessly disregarded, those numbers were wrong.  In fact, Medly had missed its revenue budget projections by more than $34 million or approximately 23 percent.  And while the numbers from Horowitz said that Medly's year-over-year revenue growth for that period was 120 percent, it was actually under 100 percent.

98.     In January 2021 (when the FP&A Senior Analyst had told Horowitz of material revenue misstatements and warned him not to raise funds based on those numbers, *supra* paragraphs 76-77), Horowitz sent additional financial information to Investor C that Horowitz knew or recklessly disregarded was inaccurate.  In response to Investor C's requests for updated information about Medly's performance, Horowitz sent Investor C financial statements that said Medly had earned more than $169 million in revenue between January and November 2020, representing year-over-year revenue growth for that period of nearly 120 percent.  Medly had actually earned approximately $19 million less than Horowitz represented, a nearly thirteen

percent difference, and Medly's revenue growth for the period was only approximately 94 percent.  Thus, Medly's purported growth according to the information provided by Horowitz was more than 26 percent higher than its actual growth.

99.     Horowitz also sent false and misleading financial information to Investor A and Investor C.  In April 2021, Investor A asked Horowitz for information about Medly's financial performance to be provided to Investor A's investment committee as part of deciding whether to make an additional investment in Medly.

100.    In response, Horowitz sent financial statements to Investor A showing that Medly had earned nearly $190 million in 2020, representing year-over-year revenue growth of 114 percent, which Horowitz knew or recklessly disregarded was false.  Medly had actually earned less than $170 million, with year-over-year revenue growth approximately 23 percent lower than the financials suggested.

101.    Horowitz did not disclose to either Investor A or Investor C that he believed Medly's revenue was overstated or that he knew that Medly senior employees had identified overstatements in Medly's revenue.

102.    For both Investor A and Investor C, the revenue numbers that Horowitz provided, the accuracy of those numbers, and the fact that Horowitz was fully disclosing Medly's financial performance to date were important to their decisions to participate in the Series C fundraising round.  In May 2021, both Investor A and Investor C participated in that round, investing approximately $12.5 million and $20 million, respectively.

103.    False and misleading financial information was similarly provided to Investor B and Investor D before their decisions to participate in Medly's Series C fundraise.

104.    In February and April 2021—after Patel had been informed of Medly's material incorrect revenue recognition, *e.g.*, paragraphs 77-82—Patel provided both Investor B and Investor D with financial statements detailing Medly's performance for 2020, which Patel knew or recklessly disregarded were inaccurate.  Both Investors were considering investments in Medly at the time, Investor B was considering adding to its existing investment and Investor D was considering its first investment.

105.    Like the financials provided by Horowitz to Investor A, the financial statements Patel sent to Investor B and Investor D said that Medly had earned nearly $190 million in 2020 when, in fact, it had earned less than $170 million, and the financial statements overstated Medly's annual revenue growth for 2020 by approximately 23 percent.

106.    Patel did not disclose to either Investor B or Investor D that he knew or recklessly disregarded that Medly's revenue was overstated, that Medly senior employees had identified overstatements in Medly's revenue to Patel, or that Patel had instructed Medly employees to stop investigating those overstatements until Medly completed its Series C fundraise.

107.    For both Investor B and Investor D, the revenue numbers that Patel provided, the accuracy of those numbers, and the fact that Patel was fully disclosing Medly's financial performance to date were important to their decisions to participate in the Series C fundraising round.  In May 2021, both Investor B and Investor D participated in that round, investing approximately $1 million and approximately $79 million, respectively.

108.    By raising funds in the Series C round, Medly—a resource-intensive business that was burning through cash but that needed to create the appearance that it was growing exponentially—was able to continue to operate; to pay salaries to Patel, Horowitz, and Bhatt, and

allow them to stay employed; and to increase the value of the Medly securities that Patel, Horowitz, and Bhatt owned.

109.    Indeed, Patel used the funds raised from investors, in part, to increase Medly's size and footprint, including acquiring a retail pharmacy chain that had twenty-eight brick-and-mortar locations and more than 800 employees.  By the end of 2022, Medly would operate thirty-two pharmacy distribution centers or locations throughout the United States.

**C.    Medly Personnel Continued to Raise Concerns Regarding the Accuracy of Medly's Financials.**

110.    While Medly's Series C fundraise was ongoing, Medly employees continued to identify material inaccuracies in Medly's revenue, and to notify Patel and Horowitz of those problems, but Patel and Horowitz continued to use the inflated revenue numbers to raise money from investors.

111.    In May 2021, an individual who is a Certified Public Accountant and Certified Internal Auditor joined Medly to lead its accounting team ("Head of Accounting").  Soon after being hired, the Head of Accounting noted and began investigating significant inaccuracies in Medly's revenue.  However, the Head of Accounting found that they were unable to obtain critical information from the BI Team related to the inaccuracies.

112.    In August 2021, the Head of Accounting contacted the Ethics Hotline of the Association of International Certified Professional Accountants ("AICPA"), a professional accountants association, to seek advice.  AICPA advised the Head of Accounting to try to correct the revenue overstatement and, if unable to do so, to resign from the company.

113.    The Head of Accounting contacted Horowitz about their "major concern" that revenue was incorrect.  Then, in October 2021, the Head of Accounting contacted Patel about concerns that Medly was not making sufficient progress to correct the company's historical

revenue overstatements, including due to obfuscation by the BI Team.  The Head of Accounting

told Patel specifically that revenue "restatements will be material to the shareholders, once we

determine the actual amounts based on [the BI Team's] work."

114.    Days later, the Head of Accounting emailed Patel, Horowitz, and the head of the

BI Team, emphasizing the concern that Medly had not corrected its revenue numbers,

> I'm starting to feel anxious about the amount of time this is taking,
> and worried about the ramifications that come from not fixing such
> an important issue on a timely basis—frankly, we have been working
> on this since last April, and I feel like the deadline has been pushed
> dozens of times.  This is concerning, due to the material and
> otherwise potentially important disclosure to investors based on this
> issue which we still need to vet and finalize.

115.    The Head of Accounting continued to investigate accounting discrepancies in the

following months and repeatedly contacted Patel about Medly's "large" and "unresolved"

revenue overstatements.  When Patel and Horowitz failed to address those issues, the Head of

Accounting resigned.

116.    During the time the Head of Accounting was repeatedly raising revenue

overstatement issues with both Patel and Horowitz, the FP&A Senior Analyst was also

continuing to identify inaccuracies in Medly's revenue.

117.    For example, the FP&A Senior Analyst prepared a written analysis of

discrepancies between revenue actually earned by two of Medly's busiest pharmacy locations, on

the one hand, and reports provided by the BI Team for those locations, on the other hand,

demonstrating how the BI Team had overstated revenue earned at those locations by tens of

millions of dollars.  In August 2021, the FP&A Senior Analyst provided that analysis to

Horowitz and others.

**D.      Between July 2021 and December 2021, Medly Obtained An Additional
Approximately $45 Million From Outside Investors.**

118.    Between July and December 2021, also as part of the first close of the Series C

fundraise, Medly obtained an additional nearly $45 million from investors, including Investor A

and Investor D, each of which added to existing investments, and Investor E, Investor H, and

Investor I, which became Medly investors.

119.    Before those investments, Patel and/or Horowitz made false and misleading

statements to those Investors, and disseminated false and misleading statements to them,

including concerning Medly's revenue.  Patel and Horowitz knew or recklessly disregarded that

these statements were false and misleading.

120.    Patel met with Investor E in February 2021 to solicit its investment in the Series C

fundraise.  After that meeting, and in response to Investor E's request for financial information

necessary to decide whether to invest in Medly, Patel sent financials that—like those described

above sent to Investor A, Investor B, and Investor D, *e.g.*, *supra* paragraphs 100 and 105—

overstated Medly's 2020 revenue by at least $20 million and overstated Medly's annual revenue

growth for 2020 by approximately 23 percent.

121.    Horowitz then sent inaccurate financials to Investor A, which he knew or

recklessly disregarded were false and misleading.  In June 2021, Investor A, who held a seat on

Medly's Board and had already participated in each of Medly's fundraising rounds, was

considering an additional investment in Medly and asked for updated financials.  In response,

Horowitz sent financials that said Medly had earned $21.5 million in revenue in January 2021,

representing year-over-year revenue growth for that month of nearly 80 percent.  That revenue

number was overstated by nearly ten percent and the financials Horowitz provided suggested that

Medly's growth rate for the month was approximately 24 percent higher than if Horowitz had

provided Medly's correct January 2021 revenues.  Those financials also overstated Medly's

revenue for April 2021 and its year-over-year growth for that month in similar amounts.

122.    In July 2021, Horowitz sent additional financials to Investor D that, like those

sent to Investor A, were false and misleading.  Indeed, they similarly overstated Medly's revenue

growth for January and April 2021, which Horowitz knew or recklessly disregarded.

123.    Relying on these financials from Horowitz and Patel, Investor A and Investor D

each added to their investments in Medly in the Series C, and Investor E made its first

investment.  In July 2021, Investor A and Investor E invested approximately $14.7 million and

$10 million, respectively.  Months later, Investor D also invested an additional $5 million.  For

Investor A, Investor D, and Investor E, the revenue numbers that Patel and Horowitz provided,

the accuracy of those numbers, and the fact that Patel and Horowitz were fully disclosing

Medly's financial performance to date were important to their decisions to participate in the

Series C fundraising round.

124.    Horowitz and Marg also provided financial information to Investor H and

Investor I in advance of their decisions to invest in Medly that Horowitz and Marg knew or

recklessly disregarded was false and misleading.

125.    In May 2021, Investor H, which had previously provided Medly with debt

financing, asked Horowitz for updated details concerning Medly's financial performance.

Horowitz responded by providing financial statements that overstated that performance, inflating

Medly's revenue for the period from January 2020 through January 2021 by more than $22

million, an amount that accounted for nearly 70 percent of the "gross profits" those financials

said Medly had earned during that time.  After receiving that information—which Horowitz

knew or recklessly disregarded was inaccurate—Investor H decided to participate in the Series C round, investing approximately $500,000.

126.     Then, in July and August 2021, Marg solicited an investment in Medly's Series C round from Investor I.  In doing so, at the end of July 2021 and to facilitate Investor I's evaluation of a possible investment in Medly, Marg provided Investor I with access to Medly financial statements via a data room.  Investor I accessed and analyzed a Medly investor deck which it then discussed with Marg.  That deck overstated Medly's 2020 revenue by more than $20 million and overstated Medly's quarterly revenue performance for each quarter of 2020 by at least nine percent and by as much as fourteen percent.  Investor I then relied on this information as part of its decision to participate in the Series C round, investing $4.5 million in Medly.

127.     Before the investments by Investor A, Investor D, Investor E, Investor H, and Investor I described above, neither Patel nor Horowitz disclosed to any of those Investors that multiple senior Medly employees had discovered overstatements in Medly's revenue and irregularities in its accounting, that those employees had informed both Patel and Horowitz of those issues, that Patel had instructed employees not to investigate those issues until Medly's Series C fundraise was completed, and that both Patel and Horowitz knew or recklessly disregarded that Medly's revenue was overstated.

### E.     Medly Employees Discovered Bhatt's Fake Prescriptions.

128.     Between November 2021 and January 2022, certain Medly employees also uncovered hundreds of fake prescriptions that, unbeknownst to them, Bhatt had created and that had resulted in millions of dollars of supposed revenue, and Patel learned of those employees' discoveries.

129.     In November 2021, a Medly accounting manager ("Accounting Manager") identified that Medly's accounts receivable included many claims by Medly to health insurance

companies for large dollar prescriptions that were associated with a single BIN number ("BIN A"). The Accounting Manager then discovered that some patients associated with these claims had been marked as deceased within Medly's records. By January 2022, the Accounting Manager discovered similar unusual prescription claims associated with another BIN number ("BIN B").

130. The fake prescriptions that the Accounting Manager had identified, and which Medly had supposedly billed to health insurance companies associated with BIN A and BIN B, had accounted for at least $13 million of Medly's purported revenue.

131. In mid-December 2021, shortly after Bhatt learned that Medly's accounting team was raising questions about BIN A, he logged into PrimeRx and changed the fake patient data for numerous claims associated with that BIN number so that the claims were no longer tied to it and would be more difficult for other Medly employees to identify. As one example, Bhatt moved some claims to new, fake patient profiles and associated them with BIN B or other health insurance companies.

132. On January 4, 2022, after emails to Bhatt from other Medly employees had gone unanswered, Medly's Head of Accounting told Bhatt that claims to BIN A and BIN B had raised "serious concerns." Bhatt emailed both the Head of Accounting and Patel acknowledging the issue, but then tried to further conceal the fraudulent data by logging into PrimeRx and deleting fake patient profiles and claims related to BIN A and BIN B.

F. **In February 2022, Medly Obtained Millions of Additional Dollars From Outside Investors.**

133. In late 2021 and early 2022, Patel continued to solicit investments in Medly as part of the Series C round, using false and misleading Medly financials to do so.

134.    For example, in December 2021, Patel met with Investor G about investing in Medly and provided a deck purportedly showing Medly's quarterly performance and revenue growth from the third quarter of 2017 through the third quarter of 2021.  This deck misrepresented Medly's 2020 and 2021 performance, which Patel knew or recklessly disregarded.  Like the information that Patel and Horowitz had sent to other potential Series C investors, the deck overstated Medly's revenue for 2020, inflating Medly's revenue for every quarter of 2020 by at least eight percent and as much as twelve percent.  The deck also overstated Medly's 2021 third quarter revenue by more than 33 percent.

135.    Patel did not disclose to Investor G that multiple senior Medly employees had discovered overstatements in Medly's revenue and irregularities in its accounting, that Patel had been informed of those issues, that he had instructed employees not to investigate those issues until Medly's Series C fundraise was completed, or that Patel knew or recklessly disregarded that Medly's revenue was overstated.

136.    For Investor G, the revenue numbers that Patel provided, the accuracy of those numbers, and the fact that Patel was fully disclosing Medly's financial performance to date were important to its decision to participate in the Series C fundraising round.  In February 2022, Investor G invested over $6.8 million in that round.

**G.    In July and August 2022, Medly Obtained an Additional More Than $7 Million From Outside Investors.**

137.    In July and August 2022, Medly conducted the second close of its Series C fundraising round.  In that close, Medly obtained more than $7 million from outside investors, including from Investor A, Investor C, Investor D, Investor E, Investor F, and Investor G.

138.    Before those investments—and during the time that Medly was marketing its Series C fundraising round but after issues regarding Medly's overstated revenue had been

repeatedly identified to Patel and Horowitz—Patel and/or Horowitz made false and misleading statements to those six Investors, and disseminated false and misleading statements to them, including concerning Medly's revenue.  Patel and Horowitz knew or recklessly disregarded that these statements were false and misleading.

139.    In September 2021, Investor A asked Medly for updated details concerning its financial performance.  Horowitz, as he had done previously, *supra* paragraphs 105 and 121, sent Investor A financial statements that overstated Medly's revenue for 2020 by more than $20 million and overstated Medly's annual revenue growth for 2020 by approximately 23 percent.

140.    In October 2021, when Investor C was considering an additional investment in Medly's Series C fundraising round, Horowitz sent financial statements that included Medly's supposed financial performance for the first half of 2021 but which were also false and misleading—they also overstated Medly revenue by many millions of dollars.

141.    Then, in advance of Medly's November 2021 Board meeting, Patel sent the Board and Board observers—including representatives of Investor A, Investor C, and Investor D— a deck that also overstated Medly's 2020 revenue, inflating Medly's quarterly revenue for every quarter of 2020 by at least nine percent and as much as fourteen percent.

142.    In April 2022, Patel sent Investor C and Investor D a deck purporting to reflect Medly's latest financial data that inflated both Medly's January 2022 and February 2022 revenue, overstating the February revenue by more than $4.6 million or nearly fourteen percent.

143.    In July 2022, Investor A asked Patel for an investor presentation and Patel sent a deck to Investor A that continued to inflate Medly's revenue.  The deck said that Medly had earned nearly $190 million in revenue in 2020 and nearly $350 million in revenue in 2021

(inclusive of the revenue earned by the retail pharmacy chain Medly had acquired).  This overstated Medly's 2020 and 2021 revenue by a total of at least $35 million.

144.     Patel and Horowitz knew or recklessly disregarded that the financial statements they had provided to Investor A, Investor C, and Investor D were inaccurate.  Neither Patel nor Horowitz disclosed to those Investors that senior Medly employees had discovered overstatements in Medly's revenue and irregularities in its accounting and had reported those issues to Patel and Horowitz, that Patel had instructed employees to not investigate those issues until Medly's Series C fundraise was completed, or that Patel and Horowitz knew or recklessly disregarded that Medly's revenue was overstated.

145.     In July and August 2022, after receiving the inaccurate financial information from Patel and Horowitz in late 2021 and early 2022, Investor A, Investor C, and Investor D all invested in the second close of Medly's Series C fundraising round, investing $600,000, $1 million, and $3.4 million, respectively.

146.     As with their earlier investments, Investor A, Investor C, and Investor D viewed the revenue numbers from Patel and Horowitz, the accuracy of those numbers, and the fact that Patel and Horowitz were fully disclosing Medly's financial performance to date as important to their decisions to invest further in Medly.

147.     Horowitz and Patel also deceived Investor E and Investor F with false and misleading financials.  In August 2021, Horowitz sent those Investors financial statements, which had been reviewed by Patel, that overstated Medly's revenue from January 2020 through July 2021 by more than $24 million or 7 percent.  The overstatement accounted for more than half of the "gross profits" those financials said Medly had earned during that period.  In May

2022, Patel sent both Investor E and Investor F purportedly updated financials with the same false and misleading information about Medly's supposed revenues.

148.    Relying on those financial statements, Investor E and Investor F both invested $200,000 in the second close of Medly's Series C fundraising round.

149.    Finally, Patel provided additional false and misleading financial statements to Investor G related to the second close of Medly's Series C fundraise.  Specifically, in January 2022, Patel sent multiple quarterly financial statements to Investor G with inaccurate revenue in advance of Investor G's decision to invest in Medly.  Those financial statements also overstated Medly's quarterly revenue for each quarter of 2020, including overstatements of quarterly revenue by as much as fourteen percent.

150.    For Investor G, the revenue numbers that Patel had provided, the accuracy of those numbers, and the fact that Patel was fully disclosing Medly's financial performance to date were important to its decision to participate in the second close of Medly's Series C fundraising round.  In July 2022, Investor G invested $600,000 in that round.

151.    Before their investments in the second close of Medly's Series C round, neither Patel nor Horowitz disclosed to Investor A, Investor C, Investor D, Investor E, or Investor F what Patel and Horowitz knew or recklessly disregarded about Medly's myriad accounting problems and fraudulent revenue.

## V.    PATEL AND HOROWITZ MADE ADDITIONAL FALSE AND MISLEADING STATEMENTS TO MEDLY'S BOARD AND BOARD OBSERVERS

152.    Patel's and Horowitz's false and misleading statements to Medly's Board and Board observers, including when those entities were considering participating in Medly's Series C fundraising round, were not limited to overstatements of Medly's revenue and revenue growth.

Those misstatements also concerned a loan obtained by Medly in exchange for Medly pledging all of its accounts receivable.

153.    In May 2021, Patel negotiated and caused Medly to enter a contract for a factoring loan, a type of financing in which a business sells their actual or projected accounts receivable or unpaid invoices in exchange for near-term funding.  As part of the loan, Medly sold, or "pledged," all of its accounts receivable to the lender.

154.    Medly had, however, already sold those same accounts receivable to other lenders and Patel had thus caused Medly's receivables to be double-pledged, creating possible cash flow problems for Medly and the potential for a serious default by Medly on its loans.

155.    Horowitz knew about the May 2021 factoring loan at the time and that its terms meant that Medly's accounts receivable were double-pledged.

156.    Neither Patel nor Horowitz disclosed the May 2021 factoring loan to Medly's Board or its existing or potential investors, including to those serving on the Board.  To the contrary, both Patel and Horowitz provided financial statements and reporting to the Board and other outside investors that hid the loan.

157.    For example, in November 2021, while Medly was marketing its Series C fundraise, Patel and Horowitz considered disclosing the factoring loan in a presentation to the Board and the Board observers—which included representatives of several entities that later made additional investments in Medly's Series C, including Investor A, Investor C, Investor D, and Investor E.

158.    Instead, Patel and Horowitz decided to present Medly's financials in a manner that would conceal the May 2021 factoring loan, which they knew or recklessly disregarded was false and misleading.

159.     In that presentation, Patel and Horowitz deliberately combined the amount of the factoring loan with other Medly debt and labeled it as "A/R Revolver," which made it appear as if Medly had one line of credit, as opposed to multiple lines of credit from multiple lenders.  By lumping the May 2021 factoring loan in with another line of credit, rather than disclosing it to the Board, Patel and Horowitz concealed that Medly's accounts receivable had been double-pledged.

## VI.     AT THE BOARD'S URGING, HOROWITZ WAS DEMOTED

160.     By at least early 2022, Medly investors who also served on Medly's Board were concerned with Horowitz's inadequate explanations about apparent irregularities and discrepancies in Medly's financials.

161.     Given these concerns, in April 2022, the Board urged Patel to remove Horowitz as Medly's CFO, and Patel removed Horowitz from that role.

162.     However, Patel then moved Horowitz to another supervisory role, as Medly's Executive Vice President of Finance & Accounting, and gave him extra compensation.  In Horowitz's new role he continued to be responsible for overseeing Medly's FP&A and accounting personnel, and critical to the review, revision, and approval of financial information for the Board and investors.

163.     Although the role was a demotion, Patel increased Horowitz's salary and renegotiated the terms of a $200,000 loan that Medly had previously made to Horowitz to make the terms more favorable to Horowitz, including making the loan forgivable if Horowitz remained employed at Medly until June 2022.  Then, in June 2022, Patel forgave the entirety of the loan.

164.     Medly's by-laws required that its Board review and approve loans to employees, like the loan to Horowitz and its subsequent amendment, but neither Patel nor Horowitz

disclosed to Medly's Board that Patel had caused Medly to loan $200,000 to Horowitz, that Patel

modified the terms to favor Horowitz after Horwitz was removed as Medly's CFO, or that Patel

forgave the loan—and the Board never approved those actions.

165.     The next month, July 2022, Horowitz resigned from Medly.

## VII.   MEDLY EMPLOYEES UNCOVERED MILLIONS OF DOLLARS OF ADDITIONAL FAKE PRESCRIPTIONS

166.     Between approximately January 2022 and August 2022, several Medly employees

discovered and reported to Patel overstatements in Medly's revenue and the fact that Medly had

improperly recognized revenue for fake prescriptions.

167.     In early 2022, two Medly regional managers observed what they believed was

unusual revenue in several monthly BI Team reports.  In those reports, the regional managers

each noted that Medly's revenue appeared to increase substantially in the last few days of each

month.  Based on a discussion with Patel in April 2022, one of the regional managers concluded

that at least one of the revenue spikes was designed to cause Medly to appear to meet its monthly

revenue target.

168.     Both regional managers investigated the revenue spikes within PrimeRx, and the

patient profiles and insurance companies to which the revenue spikes purportedly related.  They

determined that the monthly revenue spikes were caused by hundreds of fake prescriptions

linked to an insurance code called "EXPINS" and that EXPINS was not associated with a

legitimate health insurance company.

169.     In late July 2022, the regional managers informed their supervisor that they had

discovered that for the period between January 1, 2022, and June 8, 2022, more than 600

prescriptions processed through a single Medly pharmacy location were illegitimate, associated

with EXPINS, and had generated millions of dollars in purported revenue.

170.    That supervisor then separately reviewed PrimeRx data and determined that, between November 2021 and July 2022, Medly had recognized more than $67 million in revenue associated with EXPINS.  On July 29, 2022, the supervisor emailed Patel, Medly's General Counsel, and Medly's CCO about the EXPINS issue, telling them, "something doesn't look right with our revenue numbers."

171.    Subsequently, other employees reviewed PrimeRx and EXPINS-related data and discovered claims for millions of dollars in fraudulent revenue that Medly had recognized in 2021 and 2022.  Those employees pointed Patel and Medly's CCO to these fake prescriptions and revenue issues.  Immediately thereafter, Bhatt deleted hundreds of EXPINS-related prescriptions and changed the insurance codes for other claims to associate them within Medly's systems with legitimate insurance companies.

172.    Despite knowing or recklessly disregarding for years that Medly's revenue had been overstated and having been told about the EXPINS scheme and its further distortion of Medly's actual revenue to the tune of tens of millions of dollars, Patel tried to hide it from the Board.  He told certain of the Board members only that Medly had located some errant prescriptions that had been misbilled and that would affect about $2 million of Medly's profit.

173.    In fact, as Patel knew or recklessly disregarded, Medly's problem was orders of magnitude larger:  it had recognized more than $70 million in fake revenue.

174.    Even after the EXPINS issue was widely known, Patel continued to try to raise funds from investors using the fake revenue numbers, including sending a prospective investor information about Medly that overstated Medly's revenue for 2020 and 2021 by tens of millions of dollars.  That prospective investor decided not to invest.

## VIII.  MEDLY'S BOARD TERMINATED PATEL AND MEDLY ENTERED BANKRUPTCY

175.    On August 18, 2022, Medly's Board informed Patel that it had scheduled a special meeting for the following day.

176.    Patel immediately contacted Medly's drug vendor and renegotiated Medly's existing contract with the vendor—under which Patel had personally guaranteed Medly's debt to the vendor—to cause the vendor to use funds owed to Medly for insurance rebates to pay a portion of Medly's outstanding debt.  Then, the vendor withdrew at least $1.8 million from Medly's credit operating account to pay down Medly's debt.  As a result, Patel personally guaranteed far lower amounts owed by Medly to the vendor.

177.    On August 19, 2022, the Board terminated Patel from Medly.  That day, the Board also removed the CCO and suspended him from Medly.

178.    The Board then retained outside counsel to investigate potentially fraudulent conduct, including Medly's fraudulently inflated revenue.  When that law firm contacted Bhatt in October 2022, he resigned from Medly.

179.    On December 9, 2022, Medly filed for Chapter 11 bankruptcy protection.

180.    Subsequently, Medly sold all of its assets for approximately $19 million, far less than the more than $100 million in debt it owed and a fraction of its purported more than $900 million valuation at the time of its Series C fundraise.

181.    In April 2023, Medly converted its Chapter 11 bankruptcy filing to a Chapter 7 liquidation.

182.    Investors in Medly's Series C fundraise (and all other outside investors in Medly equity and convertible notes) lost the full value of their investments.

## FIRST CLAIM FOR RELIEF
### Violations of Securities Act Section 17(a)
### (Patel and Horowitz)

183.    The SEC re-alleges and incorporates by reference here the allegations in paragraphs 1 through 182.

184.    Patel and Horowitz, directly or indirectly, singly or in concert, in the offer or sale of securities and by the use of the means or instruments of transportation or communication in interstate commerce or the mails, (i) knowingly or recklessly have employed one or more devices, schemes or artifices to defraud, (ii) knowingly, recklessly, or negligently have obtained money or property by means of one or more untrue statements of a material fact or omissions of a material fact necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading, and/or (iii) knowingly, recklessly, or negligently have engaged in one or more transactions, practices, or courses of business which operated or would operate as a fraud or deceit upon the purchaser.

185.    By reason of the foregoing, Patel and Horowitz, directly or indirectly, singly or in concert, have violated and, unless enjoined, will again violate Securities Act Section 17(a) [15 U.S.C. § 77q(a)].

## SECOND CLAIM FOR RELIEF
### Violations of Exchange Act Section 10(b) and Rule 10b-5 Thereunder
### (Patel and Horowitz)

186.    The SEC re-alleges and incorporates by reference here the allegations in paragraphs 1 through 182.

187.    Patel and Horowitz, directly or indirectly, singly or in concert, in connection with the purchase or sale of securities and by the use of means or instrumentalities of interstate commerce, or the mails, or the facilities of a national securities exchange, knowingly or recklessly have (i) employed one or more devices, schemes, or artifices to defraud, (ii) made one

or more untrue statements of a material fact or omitted to state one or more material facts necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading, and/or (iii) engaged in one or more acts, practices, or courses of business which operated or would operate as a fraud or deceit upon other persons.

188.    By reason of the foregoing, Patel and Horowitz, directly or indirectly, singly or in concert, have violated and, unless enjoined, will again violate Exchange Act Section 10(b) [15 U.S.C. § 78j(b)] and Rule 10b-5 thereunder [17 C.F.R. § 240.10b-5].

### THIRD CLAIM FOR RELIEF
### Violations of Securities Act Section 17(a)(1) and (3)
### (Bhatt)

189.    The SEC re-alleges and incorporates by reference here the allegations in paragraphs 1 through 171 and 178 through 182.

190.    Bhatt, directly or indirectly, singly or in concert, in the offer or sale of securities and by the use of the means or instruments of transportation or communication in interstate commerce or the mails, (i) knowingly or recklessly has employed one or more devices, schemes or artifices to defraud, and/or (ii) knowingly, recklessly, or negligently has engaged in one or more transactions, practices, or courses of business which operated or would operate as a fraud or deceit upon the purchaser.

191.    By reason of the foregoing, Bhatt, directly or indirectly, singly or in concert has violated and, unless enjoined, will again violate Securities Act Section 17(a)(1) and (3) [15 U.S.C. § 77q(a)(1), (3)].

## FOURTH CLAIM FOR RELIEF
### Violations of Exchange Act Section 10(b) and Rule 10b-5(a) and (c) Thereunder
### (Bhatt)

192.    The SEC re-alleges and incorporates by reference here the allegations in paragraphs 1 through 171 and 178 through 182.

193.    Bhatt, directly or indirectly, singly or in concert, in connection with the purchase or sale of securities and by the use of means or instrumentalities of interstate commerce, or the mails, or the facilities of a national securities exchange, knowingly or recklessly (i) employed one or more devices, schemes, or artifices to defraud, and/or (ii) engaged in one or more acts, practices, or courses of business which operated or would operate as a fraud or deceit upon other persons.

194.    By reason of the foregoing, Bhatt, directly or indirectly, singly or in concert, has violated and, unless enjoined, will again violate Exchange Act Section 10(b) [15 U.S.C. § 78j(b)] and Rules 10b-5(a) and (c) thereunder [17 C.F.R. § 240.10b-5(a) and (c)].

## FIFTH CLAIM FOR RELIEF
### Aiding and Abetting Violations of Securities Act Section 17(a)(2)
### (Bhatt)

195.    The SEC re-alleges and incorporates by reference here the allegations in paragraphs 1 through 171 and 178 through 182.

196.    As alleged above, Patel and Horowitz violated Securities Act Section 17(a)(2) [15 U.S.C. § 77q(a)(2)].

197.    Bhatt knowingly or recklessly provided substantial assistance to Patel and Horowitz with respect to their violations of Securities Act Section 17(a)(2) [15 U.S.C. § 77q(a)(2)].

198.    By reason of the foregoing, Bhatt is liable pursuant to Securities Act Section 15(b) [15 U.S.C. § 77o(b)] for aiding and abetting Patel's and Horowitz's violations of Securities

Act Section 17(a)(2) [15 U.S.C. § 77q(a)(2)] and, unless enjoined, Bhatt will again aid and abet these violations.

## SIXTH CLAIM FOR RELIEF
### Aiding and Abetting Violations of Exchange Act Section 10(b) and Rule 10b-5(b)
### (Bhatt)

199.    The SEC re-alleges and incorporates by reference here the allegations in paragraphs 1 through 171 and 178 through 182.

200.    As alleged above, Patel and Horowitz violated Exchange Act Section 10(b) [15 U.S.C. § 78j(b)] and Rule 10b-5(b) [17 C.F.R. § 240.10b-5(b)] thereunder.

201.    Bhatt knowingly or recklessly provided substantial assistance to Bhatt and Horowitz with respect to their violations of Exchange Act Section 10(b) [15 U.S.C. § 78j(b)] and Rule 10b-5(b) [17 C.F.R. § 240.10b-5b] thereunder.

202.    By reason of the foregoing, Bhatt is liable pursuant to Exchange Act Section 20(e) [15 U.S.C. § 78t(e)] for aiding and abetting Patel's and Horowitz's violations of Exchange Act Section 10(b) [15 U.S.C. § 78j(b)] and Rule 10b-5(b) [17 C.F.R. § 240.10b-5(b)] thereunder and, unless enjoined, Bhatt will again aid and abet these violations.

## PRAYER FOR RELIEF

WHEREFORE, the SEC respectfully requests that the Court enter a Final Judgment:

## I.

Permanently enjoining Defendants and their agents, servants, employees and attorneys and all persons in active concert or participation with any of them from violating, directly or indirectly, Securities Act Section 17(a) and Exchange Act Section 10(b) [15 U.S.C. §§ 77q(a) and 78j(b)], and Rule 10b-5 [17 C.F.R. § 240.10b-5].

**II.**

Ordering Defendants to disgorge all ill-gotten gains they received directly or indirectly, with pre-judgment interest thereon, as a result of the alleged violations, pursuant to Exchange Act Sections 21(d)(3), 21(d)(5), and 21(d)(7) [15 U.S.C. §§ 78u(d)(3), 78u(d)(5), 78u(d)(7)];

**III.**

Ordering Defendants to pay civil monetary penalties under Securities Act Section 20(d) [15 U.S.C. § 77t(d)] and Exchange Act Section 21(d)(3) [15 U.S.C. § 78u(d)(3)];

**IV.**

Permanently prohibiting each Defendant from serving as an officer or director of any company that has a class of securities registered under Exchange Act Section 12 [15 U.S.C. § 78l] or that is required to file reports under Exchange Act Section 15(d) [15 U.S.C. § 78o(d)], pursuant to Securities Act Section 20(e) [15 U.S.C. § 77t(e)] and Exchange Act Section 21(d)(2) [15 U.S.C. § 78u(d)(2)]; and

**V.**

Granting any other and further relief this Court may deem just and proper.


[REMAINDER OF PAGE INTENTIONALLY BLANK]

## JURY DEMAND

The Commission demands a trial by jury.

Dated: New York, New York
September 12, 2024

    /s/ Antonia Apps

ANTONIA M. APPS
REGIONAL DIRECTOR
Sheldon L. Pollock
Judith A. Weinstock
Christopher M. Colorado
Suzanne M. Bettis
Heather Marshall Molavi
Attorneys for Plaintiff
SECURITIES AND EXCHANGE COMMISSION
New York Regional Office
100 Pearl Street
Suite 20-100
New York, NY 10004-2616
212-336-9143 (Colorado)
ColoradoCh@sec.gov