**ANTONIA M. APPS**
**REGIONAL DIRECTOR**
**Sheldon L. Pollock**
**Judith A. Weinstock**
**Christopher M. Colorado**
**Suzanne M. Bettis**
**Heather Marshall Molavi**
**Attorneys for Plaintiff**
**SECURITIES AND EXCHANGE COMMISSION**
**New York Regional Office**
**100 Pearl Street, Suite 20-100**
**New York, NY 10004-2616**
**212-336-9143 (Colorado)**
**ColoradoCh@sec.gov**

**UNITED STATES DISTRICT COURT**
**EASTERN DISTRICT OF NEW YORK**

| | |
|---|---|
| **SECURITIES AND EXCHANGE COMMISSION,**<br><br>                    **Plaintiff,**<br><br>        **-against-**<br><br>**MARG PATEL, ROBERT HOROWITZ, and CHINTANKUMAR BHATT,**<br><br>                    **Defendants.** | **AMENDED COMPLAINT**<br><br>1:24-cv-06405<br><br>JURY TRIAL DEMANDED |

Plaintiff Securities and Exchange Commission ("SEC"), for its Amended Complaint against Defendants Marg Patel ("Patel"), Robert Horowitz ("Horowitz"), and Chintankumar Bhatt ("Bhatt") (collectively, "Defendants"), alleges as follows:

### SUMMARY

1.       From at least February 2021 through August 2022, defendants—Patel, the former chief executive officer of Medly Health, Inc. ("Medly"), a now-defunct privately held online pharmacy company; Horowitz, Medly's former chief financial officer; and Bhatt, Medly's

former head of Rx Operations—deceived investors about Medly's business, including through repeated false and misleading misrepresentations about Medly's growth and revenues.

2.      Medly was marketed to investors as a company that was disrupting the pharmacy industry by providing a full-service online pharmacy experience, from the moment a doctor wrote a prescription through delivery of the prescribed medication to the patient, that would limit the need for brick-and-mortar locations and minimize the associated costs.  Investors were told that Medly was succeeding wildly as the "nation's fastest-growing digital pharmacy" with exploding revenue growth.

3.      In reality, Medly's revenue and revenue growth were grossly overstated and much of it was built on fake prescriptions and accounting irregularities.  Overall, Medly created at least $70 million in fake revenue and during various periods reported revenue to prospective investors that was fraudulently inflated by between 10 percent and 24 percent for those periods.

4.      For years, Bhatt had been creating hundreds of fake prescriptions for high-dollar medications in Medly's internal pharmacy management system resulting in millions of dollars of accounts receivable or revenue that was not real and that Medly would never receive.  During that time, Bhatt had significant responsibilities monitoring and driving Medly's revenue from prescription sales and he knew or recklessly disregarded that his fake prescriptions falsely inflated Medly's financial performance.

5.      At the same time, Medly attempted to restrict many of its U.S.-based accounting and finance employees from that internal pharmacy management system—including the raw data showing the fake prescriptions and resulting fake revenue—and required many of those employees to outsource and rely on analyses of that data by an India-based subsidiary, resulting

in the U.S.-based Medly teams using financial information from the subsidiary replete with irregularities and inaccuracies.

6. Despite these restrictions, several Medly employees discovered problems in Medly's financial data and identified material revenue overstatements and they repeatedly notified Patel and Horowitz of the irregularities and overstatements, and Patel and Horowitz both acknowledged that those irregularities and overstatements existed.

7. Although Patel and Horowitz knew or recklessly disregarded that Medly's revenue numbers were wrong and materially overstated, they each conveyed those inflated numbers to potential investors to educate those potential investors about Medly's business and used that false and misleading financial data to persuade investors to buy more than $170 million worth of Medly stock and convertible notes.

8. By April 2022, the scheme began to unravel. At the urging of Medly's Board of Directors (the "Board"), Horowitz was demoted and he resigned soon thereafter. When Medly's accounting issues and Bhatt's fake prescriptions became known by many within the company, the Board fired Patel. Bhatt also resigned. Medly's business quickly deteriorated and it filed for Chapter 11 bankruptcy protection in December 2022 and, in April 2023, converted that action to a Chapter 7 liquidation. Those who had invested in Medly lost their entire investment.

**VIOLATIONS**

9. By virtue of the above conduct and as alleged further here, Patel and Horowitz violated Section 17(a) of the Securities Act of 1933 ("Securities Act") [15 U.S.C. § 77q(a)] and Section 10(b) of the Securities Exchange Act of 1934 ("Exchange Act") [15 U.S.C. § 78j(b)], and Rule 10b-5 thereunder [17 C.F.R. § 240.10b-5].

10. By virtue of the above conduct and as alleged further here, Bhatt violated Sections 17(a)(1) and 17(a)(3) of the Securities Act [15 U.S.C. § 77q(a)(1) and (3)], and Section 10(b) of

the Exchange Act [15 U.S.C. § 78j(b)] and Rules 10b-5(a) and (c) thereunder [17 C.F.R.

§ 240.10b-5(a) and (c)].  Bhatt further aided and abetted Patel's and Horowitz's violations of

Securities Act Section 17(a)(2) [15 U.S.C. § 77q(a)(2)] and Section 10(b) of the Exchange Act

[15 U.S.C. § 78j(b)] and Rule 10b-5(b) thereunder [17 C.F.R. § 240.10b-5(b)].

11.     Unless Defendants are restrained and enjoined, they will engage in the acts,

practices, transactions, and courses of business set forth in this Amended Complaint or in acts,

practices, transactions, and courses of business of similar type and object.

### NATURE OF THE PROCEEDINGS AND RELIEF SOUGHT

12.     The SEC brings this action pursuant to the authority conferred upon it by

Securities Act Sections 20(b) and 20(d) [15 U.S.C. §§ 77t(b), 77t(d)] and Exchange Act Section

21(d) [15 U.S.C. § 78u(d)].

13.     The SEC seeks a final judgment:  (a) permanently enjoining each Defendant from

violating, directly or indirectly, Securities Act Section 17(a) and Exchange Act Section 10(b) [15

U.S.C. §§ 77q(a) and 78j(b)], and Rule 10b-5 [17 C.F.R. § 240.10b-5]; (b) ordering Defendants

to disgorge all ill-gotten gains they received as a result of the violations alleged here and to pay

prejudgment interest thereon, pursuant to Exchange Act Sections 21(d)(3), 21(d)(5), and 21(d)(7)

[15 U.S.C. §§ 78u(d)(3), 78u(d)(5), 78u(d)(7)]; (c) ordering Defendants to pay civil money

penalties pursuant to Securities Act Section 20(d) [15 U.S.C. § 77t(d)] and Exchange Act Section

21(d)(3) [15 U.S.C. § 78u(d)(3)]; (d) permanently prohibiting each Defendant from serving as an

officer or director of any company that has a class of securities registered under Exchange Act

Section 12 [15 U.S.C. § 78l] or that is required to file reports under Exchange Act Section 15(d)

[15 U.S.C. § 78o(d)], pursuant to Securities Act Section 20(e) [15 U.S.C. § 77t(e)] and Exchange

Act Section 21(d)(2) [15 U.S.C. § 78u(d)(2)]; and (e) ordering any other and further relief the

Court may deem just and proper.

## JURISDICTION AND VENUE

14.     This Court has jurisdiction over this action pursuant to Securities Act Section

22(a) [15 U.S.C. § 77v(a)] and Exchange Act Section 27 [15 U.S.C. § 78aa].

15.     Defendants, directly and indirectly, have made use of the means or

instrumentalities of interstate commerce or of the mails in connection with the transactions, acts,

practices, and courses of business alleged herein.

16.     Venue lies in this District under Securities Act Section 22(a) [15 U.S.C. § 77v(a)]

and Exchange Act Section 27 [15 U.S.C. § 78aa] because certain of the transactions, acts,

practices, and courses of business alleged herein occurred within this District.  Among other

things, Medly maintained its headquarters in Brooklyn, New York, where its employees,

including Defendants, regularly conducted business.

## DEFENDANTS

17.     **Patel**, age 36, is a resident of Staten Island, New York.  Patel co-founded Medly

and served as its CEO until August 2022, when Medly's Board terminated him.  As CEO, Patel

ran Medly's operations; created, reviewed, edited, approved, and finalized information about

Medly's financial and operational performance for, and conveyed that information to, Medly's

Board and its prospective and existing investors; and led Medly's efforts to raise money from

investors.  Patel was also a director of Medly's India-based subsidiary, Medly Software Systems

LLP.  During the SEC's investigation that preceded this action, Patel invoked his Fifth

Amendment privilege against self-incrimination, refused to produce documents in response to an

SEC subpoena, and refused to answer all substantive questions during sworn testimony.

18.     **Horowitz**, age 39, is a resident of Colts Neck, New Jersey.  Horowitz earned a

bachelor's degree in finance and a master's degree in business administration and previously

held Series 7, 63, and 65 securities representative and investment adviser licenses.  Horowitz was

employed by Medly for over two-and-a-half years. Between approximately December 2019 and April 2022, Horowitz was Medly's CFO. In April 2022, Horowitz was demoted to a role as Medly's Executive Vice President of Finance & Accounting and remained in that position until he resigned in July 2022. In both roles, Horowitz directed Medly's accounting and financial planning and analysis ("FP&A") and the teams that assisted him with that FP&A, including directing the FP&A and accounting teams as to how Medly's financial performance should be presented in financial statements and forecasts (something that Horowitz did together with Patel). Horowitz also created, reviewed, edited, approved, and finalized financial information for—and he conveyed that information to—Medly's prospective and existing investors.

19.    **Bhatt**, age 38, is a resident of Monroe, New Jersey. Bhatt has earned two degrees, a "Bachelor of Pharmacy" and a masters in "Business Administration in Finance." Between approximately January 2019 and October 2022, Bhatt was Medly's Head of Rx Operations and a member of its "Leadership Team." An important component of Bhatt's role was monitoring and assessing Medly's most profitable medications, Medly's sales and revenue, and Medly's financial performance against its forecasts and targets. Before Medly, Bhatt was a long-time associate of Patel and Patel's family and had worked (and continues to work) at other pharmacies in which Patel has an ownership stake. During the SEC's investigation that preceded this action, Bhatt invoked his Fifth Amendment privilege against self-incrimination, refused to produce documents in response to an SEC subpoena, and refused to answer all substantive questions during sworn testimony.

## RELEVANT ENTITIES

20.    **Medly**, formed in 2017 and incorporated in 2018 in Delaware, had its principal place of business in Brooklyn, New York. Medly was privately held and purported to be a "full-service digital pharmacy platform" with same-day prescription delivery. Medly also maintained

physical pharmacy locations and distribution centers.  Medly is currently in bankruptcy proceedings under Chapter 7 of the U.S. Bankruptcy Code.

21.     **Medly Software Systems LLP ("Medly Software")**, incorporated in 2019 in India, is an entity registered to do business in India and with its principal place of business in Pune, India.  Medly Software was a subsidiary of Medly.  During the relevant period, Medly Software provided accounting, financial, and data analytics services to Medly, including through the Medly Software employees referred to as the "Business Intelligence Team" or "BI Team."

22.     **Investor A** is a venture capital firm that invested more than $60 million in Medly, including more than $27 million in Medly's Series C fundraising round.  Beginning in February 2019, Investor A held a seat on Medly's Board.

23.     **Investor B** is a venture capital firm that invested approximately $5 million in Medly, including approximately $1 million in Medly's Series C fundraising round.  Beginning in March 2019, Investor B had observer rights on Medly's Board.

24.     **Investor C** is a growth equity firm that invested more than $50 million in Medly, including more than $20 million in Medly's Series C fundraising round.  Beginning in March 2020, Investor C held a seat on Medly's Board.

25.     **Investor D** is a growth equity firm that invested more than $85 million in Medly's Series C fundraising round.  Beginning in May 2021, Investor D held a seat on Medly's Board.

26.     **Investor E** is a venture capital firm that invested more than $10 million in Medly's Series C fundraising round.  Beginning in July 2021, Investor E had observer rights on Medly's Board.

27.     **Investor F** is a venture capital firm that invested more than $10 million in Medly's Series C fundraising round.

28.     **Investor G** is a venture capital firm that invested more than $7 million in Medly's Series C fundraising round.

29.     **Investor H** is a venture capital firm that invested approximately $500,000 in Medly's Series C fundraising round.

30.     **Investor I** is a growth equity firm that invested approximately $4.5 million in Medly's Series C fundraising round.

## FACTS

## I.    MEDLY WAS OPERATED BY DEFENDANTS

31.     Since before 2017, Patel and his family owned, in full or in part, several New York-based pharmacies.  Patel served on the boards of directors of some of those pharmacies.

32.     In 2017, Patel, together with his brother, founded Medly to be a full-service online pharmacy through which medical providers could submit prescriptions, patients could have those prescriptions filled, and the prescribed medications would be delivered to the patients.

33.     At its formation, Patel became Medly's CEO.  In that role, Patel oversaw and managed Medly's operations and business development and Medly's fundraising from investors, among other things.

34.     Patel and his brother initially funded Medly through $900,000 in unsecured loans, and, at that time, Patel and his brother each owned more than forty percent of Medly.

35.     Thereafter, Medly earned revenue by processing prescriptions from medical providers and their patients, maintaining an inventory of medications, using that inventory to fill prescriptions, validating patients' insurance coverage, filing claims with health insurance companies, delivering prescribed medications to patients, and obtaining payment from patients

and insurance companies.  Part of Medly's business plan was to gain market share in filling high-dollar, specialty medications.

36.    Medly began significantly expanding its staff in 2018, growing from approximately 120 employees at the end of that year to more than 380 employees by the end of 2019.  During that time, Medly also expanded its physical footprint, which included both pharmacy locations and distribution centers, from New York and New Jersey to Pennsylvania.

37.    In or around January 2019, Medly hired Bhatt as the Director of Rx Operations.  Later, Bhatt's title changed to Head of Rx Operations.  In those roles, among other things, Bhatt managed and monitored Medly's sales and inventory of Medly's primary product and service: prescribed medications.  This included Bhatt monitoring and driving Medly's sales performance (including monitoring revenue performance against Medly's targets), monitoring financial and accounting-related metrics, like Medly's inventory costs and costs of goods sold, and tracking the most profitable prescribed medications that Medly sold.

38.    According to information submitted by Medly to the U.S. Department of Homeland Security as part of Bhatt's application for an H-1B Visa, Bhatt's responsibilities included, "[r]eview[ing] and coordinated[ing] the company's fiscal goals with the President to increase the overall profitability."

39.    Indeed, Bhatt was part of a group within Medly—which also included Patel and Horowitz—that set Medly's periodic revenue targets and Bhatt devised strategies for Medly to meet those targets and "enhance" profitability, including creating incentive programs to increase Medly's share of profitable prescribed medications.

40.    Bhatt also regularly received reports concerning Medly's performance against those targets, including daily reports of the prescribed medications most profitable to Medly,

monthly reports of Medly's actual revenue compared to Medly's forecasted revenue, and daily reports of millions of dollars of revenue "reversals" by Medly.

41.     In his Medly roles, Bhatt worked and communicated nearly every day with Medly's India-based Business Intelligence team, which provided accounting, financial, and data analytics services to Medly.  Among many other things, Bhatt worked with the Business Intelligence team in creating internal software applications and "dashboards" that analyzed, compiled, and presented Medly's "actual" revenue and profitability compared to its targeted revenue and profitability.

42.     Bhatt also regularly communicated with Medly's U.S.-based FP&A and accounting teams related to Medly's month-end accounting processes and their work related to Medly's periodic financial statements.  For example, Bhatt provided data inputs necessary for the FP&A and accounting teams to create Medly's financial statements, including Medly's inventory, inventory costs, sales, and cost of goods sold, and the FP&A and accounting teams told Bhatt that the data he provided was being used to create financial statements, including for Medly to obtain third-party financing.  Members of Medly's FP&A and accounting teams also periodically shared Medly's full financial statements with Bhatt.

43.     Additionally, at multiple points in 2021, when the Medly FP&A and accounting teams considered changes to Medly's processes for revenue recognition in its financial statements, Bhatt was included in those discussions.  Members of the accounting teams told Bhatt explicitly that his work—including the numbers he provided and adjustments to those numbers—could impact Medly's financial statements.

44.     During his employment, Medly issued Bhatt options to purchase more than one million shares of Medly common stock.

45.    In December 2019, Medly hired Horowitz as its CFO.

46.    As CFO, Horowitz analyzed Medly's financial performance and drafted and edited financial statements and financial forecasts for Medly's Board, for actual and potential investors, and for other capital markets activity by Medly, including for Medly's debt lenders.  In Horowitz's own words, he "focus[ed] on the 'numbers', essentially the financial performance of the business."

47.    Horowitz also regularly interacted with Medly's Board and actual and potential investors, making presentations to them and answering their questions about Medly's financial performance.

48.    Horowitz, together with Patel, devised Medly's strategies for raising funds through sales of Medly equity, including with respect to Medly's Series C fundraising round.

49.    During his employment, Medly issued Horowitz more than three and a half million shares of Medly common stock.  Additionally, under the terms of his employment, the amount of Horowitz's annual bonus was to be determined by Medly's Board based on Medly's financial performance, among other things.

## II.    MEDLY CONDUCTED TWO INITIAL FUNDRAISING ROUNDS AND INVESTORS IN THOSE ROUNDS JOINED MEDLY'S BOARD

50.    Between March 2019 and May 2020, Medly conducted two fundraising rounds from outside sources, its Series A and Series B fundraises.

51.    In those fundraising rounds, each of which was a private placement, Medly sold preferred equity shares and notes that were convertible to preferred equity shares to outside accredited investors for more than $75 million.[1]

---

[1] In general, a private placement is an offering and/or sale of securities that is exempt from the registration requirements of the federal securities laws and the Commission, including, for example, because the offering and sale is only to accredited investors, among other requirements.

52.     Investor A, Investor B, and Investor C each invested in one or both of the Series A and Series B rounds.  In connection with those investments, Investor A and Investor C each obtained Board seats and Investor B obtained Board observer rights.

53.     Based on the Series A fundraise, Medly's valuation was approximately $50 million.  As of the later Series B fundraise, Medly's valuation had grown to nearly $270 million.

## III.    MEDLY CREATED FAKE PRESCRIPTIONS AND CONCEALED FALSELY INFLATED REVENUE

54.     Since at least approximately January 2020, Medly's operations and accounting were plagued with issues that resulted in its financial statements being inaccurate, including because of hundreds of fake prescriptions created by Bhatt in Medly's systems.

55.     Both Patel and Horowitz knew that Medly's revenue numbers were inaccurate, yet each used those inaccurate numbers to raise an additional more than $170 million from outside investors in Medly's later Series C fundraising round.

### A.    Bhatt Created Fake Prescriptions and Medly Recognized Revenue From Them.

56.     Medly earned most or all of its revenue by selling medications to fill prescriptions, either from payments from health insurance companies or patients.

57.     Medly used pharmacy management software called "PrimeRx."

58.     Through PrimeRx, Medly managed patient accounts, health insurance company details, prescriptions (including prior authorizations and the amounts to be paid for prescriptions), medication inventory (including the costs of medications to Medly), and billing to patients and health insurance companies, among other things.

59.     Within Medly, each employee's access to and permissions within PrimeRx depended on the employee's role.  For example, some employees were permitted to view

patients' profiles and prescription needs, while others were not.  Similarly, some employees were permitted to create data within and delete data from PrimeRx, while others were not.

60.    Bhatt had full administrative-level access to PrimeRx features.  He was not siloed from or limited in his ability to access or manipulate Medly data.

61.    Starting no later than November 2020, Bhatt created entries in PrimeRx for prescriptions that Medly had supposedly filled but that, in truth, did not actually exist and were never filled by Medly.  These purported prescriptions—many of which were for high-dollar, specialty medications, including medications that cost as much as $172,000 each—were fake.

62.    In many instances, Bhatt entered the fake prescriptions to correspond with former Medly patients who had been marked within Medly's records as deceased.  In other instances, Bhatt created profiles for patients he had invented (*i.e.*, persons who were either not patients of Medly or did not exist) and entered fake prescriptions to correspond to those fake patient profiles within PrimeRx.  These were not real prescriptions and they were not written by any medical professional for any actual person.  For example, and among hundreds of other examples between 2020 and 2022:

        a.    On or around December 7, 2021, Bhatt created a new PrimeRx user profile supposedly for a "pharmacy technician," but that did not relate to any Medly employee.  Over two days, Bhatt used that profile to create more than thirty "patient profiles" for persons who were not Medly customers and do not appear to exist.  Bhatt used those "patient profiles" to create myriad prescriptions for those purported "patients" and then marked those prescriptions—and the amounts to be paid for them—as billed to an insurance company.  The insurance company also did not exist.

13

b.      On or around February 22, 2022, Bhatt created a prescription for a multi-month supply of the anti-inflammation drug Xeljanz XR for a patient and marked that prescription within Medly's system as having been billed to health insurance company code "EXPINS" for more than $15,000. However, the patient did not exist; no prescription had been written for Xeljanz XR for that patient; and the prescription was not actually billed to the health insurance company, which also did not exist.

c.      In early 2022, Bhatt created multiple, high-dollar prescriptions for a single patient—including multi-month supplies for multiple HIV medications, several arthritis medications, a treatment for hepatitis, and a treatment for Crohn's disease—and marked those prescriptions as "billed" to health insurance company code "EXPINS" for more than $300,000.  Again, no prescriptions had been written for those medications for that patient, who had previously been marked as deceased in Medly's system, and the prescriptions were not actually billed to the insurance company, which did not exist.

63.      In total, from at least November 2020 through July 2022, Bhatt created hundreds of fake prescriptions for high-dollar medications amounting to tens of millions of dollars that Medly had supposedly (but had not actually) filled and delivered.

64.      Bhatt then caused these fake prescriptions to appear within PrimeRx as if they had been billed to health insurance companies and that Medly was owed and/or had been paid for such prescriptions.  Like the prescriptions and patient profiles Bhatt had created, both the billing and related accounts receivable or revenue were fake.  The companies to which the fake

prescriptions had supposedly been billed either did not exist or were not health insurance companies.

65.     As an example, within PrimeRx, Bhatt created a Bank Identification Number or "BIN"—which health insurance plans use to process electronic pharmacy claims—for two health insurance companies that did not exist.  Then, Bhatt created entries showing that the fake prescriptions had been "billed" to the BIN for these fake health insurance companies such that Medly was owed payment.

66.     During this time, Bhatt also regularly created and disseminated within Medly, including to Patel and Horowitz, reports showing Medly's periodic financial results, which included the number of particular prescriptions sold within particular periods, as well as accounts receivable or revenue related to the fake prescriptions he had created.

67.     These fake prescriptions and the purported payments that Medly supposedly received or was to receive related to them were incorporated into Medly's financial statements— indeed, Medly recognized millions of dollars of revenue or accounts receivable from them.

68.     Bhatt knew or recklessly disregarded that his fake prescriptions, fake billing, and the purported payments that Medly supposedly received or was to receive related to them were incorporated into Medly's financial statements and falsely inflated Medly's financial performance including because, among other reasons, Medly's primary product and means of revenue was the prescriptions that it filled, and Medly's accounting and FP&A personnel had specifically told Bhatt that his work in PrimeRx could affect Medly's financial statements.

69.     Bhatt knew or recklessly disregarded that Medly used equity to raise funds for its business:  he owned options to purchase Medly stock, the value of which was tied to Medly's ongoing fundraises (*i.e.*, as Medly's fundraising increased the company's valuation, the value of

options to purchase Medly equity also increased), and Bhatt highlighted in emails to his family that Medly was funded by outside equity investors.

70.      Likewise, Bhatt also knew or recklessly disregarded that Medly was engaged in fundraising from investors during the time he was creating the fake prescriptions.  When Medly was raising funds in its Series C fundraise between late 2020 and mid-2022, that fact was widely discussed within Medly.  Moreover, Bhatt was specifically asked to contribute to diligence responses for at least one of Medly's Series C prospective investors in connection with that investor's evaluation of an investment in Medly.

71.      Bhatt also tried to conceal his fraudulent conduct.  He caused the majority of the fake prescriptions to relate to Medly's three busiest pharmacy locations, where they might be less conspicuous, and typically created the fake information within PrimeRx well outside of normal working hours, when other Medly employees were less likely to see his manipulation happening.  Bhatt then regularly revised the fake information he had input into PrimeRx, including moving the fake prescriptions from one fake patient profile to another and from one BIN number to another, to attempt to keep his conduct from being discovered.

72.      Bhatt's conduct was hidden, for a time, by the way in which Medly performed its financial and accounting work and structured its FP&A and accounting teams.

73.      Unlike Bhatt, many of Medly's U.S.-based accounting and FP&A personnel lacked direct or full access to PrimeRx and the raw Medly operational and financial data maintained therein.

74.      Patel and Horowitz directed Medly's accounting and FP&A personnel to obtain that data and analyses of it from Medly Software, Medly's India-based subsidiary.

75.     Within Medly Software, data analyses were done by the so-called "Business Intelligence Team" or "BI Team," which regularly coordinated with Bhatt, was run by a long-time business partner of Patel, and had access to PrimeRx.

76.     The BI Team revised, aggregated, and analyzed PrimeRx data and created reports concerning or data exports reflecting Medly's financial performance.  Among other examples, the BI Team used PrimeRx to review prescription and sales data from Medly's individual locations and distribution centers and on a consolidated basis; and to aggregate and analyze that data to calculate Medly's sales, inventory, and cost of goods sold.

77.     The BI Team routinely overstated Medly's assets and revenue, including because it incorporated Bhatt's fake prescriptions and because of other irregularities and inaccuracies.

78.     The BI Team sent its financial reports and analyses to Medly's U.S.-based accounting and FP&A personnel who, in turn, used those reports and analyses—which were inaccurate—to create financial reports, statements, and forecasts for Medly's Board and existing and potential investors.

79.     As discussed below, both Patel and Horowitz conveyed Medly's inaccurate financial reports, statements, and forecasts to potential investors and obtained $170 million in investments from them.

**B.     Before Medly's Series C Fundraising Round, Patel and Horowitz Knew, Or Recklessly Disregarded, that Medly's Revenue was Overstated.**

80.     In late 2020, Investor C, while doing diligence related to a possible investment in Medly, expressed concerns to Patel and Horowitz about a potential accounting irregularity: a substantial and growing debit balance in a Medly expense accrual account that was listed under Medly's Other Current Liabilities ("OCL") line item.

81.     In general, OCL reflect liabilities that a company expects to pay within one year. These liabilities are short-term in nature and are meant to include various liabilities that do not fall under more specific categories like accounts payable or short-term debt.

82.     An expense accrual account generally represents expenses a company has incurred but has not yet paid.  This might include, for example, salary a company owes for a particular period but has not paid.  An expense accrual account is intended to ensure that expenses are recognized when they occur even if paid later.

83.     In accrual accounting, which Medly used, the entries in an expense accrual account are generally credits on the company's balance sheet, and not debits, because they are amounts that have been earmarked for future payment and will be removed and reduced to zero when paid.

84.     Because an expense accrual account typically reflects a credit balance consisting of the sum of expenses the company has incurred but has not yet paid, a debit balance in an expense accrual account—like that noted by Investor C to Patel and Horowitz—is unusual and can suggest an error in the financial statements.

85.     In or around November 2020, after Investor C identified the potential issue with the OCL account, Medly engaged accounting firms to assist in "cleaning up" its financial statements.

86.     By December 2020, Medly had informed its Board of Directors and Board observers, which included Investor A, Investor B, and Investor C, that it had largely resolved the issue related to the OCL account and did not expect it to have meaningful effect on Medly's profits or losses.  In truth, Medly had not resolved the inaccuracies and irregularities in its financial statements and those inaccuracies and irregularities were not immaterial.

87. Indeed, in November 2020, Horowitz told one of the accounting firms that he believed Medly's revenue numbers could be overstated by as much as twenty percent.

88. That accounting firm understood from Horowitz that Medly's OCL line item was being used as a "plug," *i.e.*, a line item to record the difference between revenue Medly included in its financial statements, on the one hand, and revenue supported by Medly's actual cash and accounts receivable, on the other hand.[2]  Said differently, not later than November 2020, Horowitz had determined that Medly's financial statements overstated its financial performance—including its revenue, revenue growth, and profitability—and that this "plug" in its financials was being used to conceal those material errors.

89. Using Medly's raw operational data, Horowitz's direct reports on Medly's FP&A and accounting teams investigated errors and irregularities in Medly's financial statements, (including the "plug," among other things), and they told Horowitz and Patel of actual and material errors in those financial statements, including concerning Medly's overstated revenue.

90. Those employees determined that the BI Team and Medly had been reporting revenue in amounts significantly higher than Medly's actual revenue as calculated from Medly's raw data for prescriptions sold.

91. Those employees informed Horowitz and Patel of the errors in Medly's financial statements and that Medly's financial statements materially overstated Medly's financial performance—and they did so ***before*** Medly raised funds in its Series C fundraise.

---

[2] In or around December 2020, Medly reported to its Board that it had reversed approximately $1.8 million of revenue from early 2020 purportedly related to uncollected copayments.  The impact of the accounting irregularities and fake prescriptions alleged herein were exponentially larger than this reported change.

92.     For example, in January 2021, a senior analyst on Medly's FP&A team ("FP&A Senior Analyst") obtained raw data from PrimeRx from another employee who had access to that system.  The FP&A Senior Analyst compared the raw PrimeRx data against the BI Team's prior financial reports and determined that the BI Team had repeatedly overstated Medly's revenue.

93.     The FP&A Senior Analyst told Horowitz about these overstatements and that the FP&A Senior Analyst understood, based on their analysis of the BI Team's overstatements, that Medly, too, had been overstating revenue.  The FP&A Senior Analyst told Horowitz that Medly should not fundraise based on the overstated revenue, and Horowitz told Patel of the overstatements.

94.     As another example, also in January 2021, a Medly senior accountant ("Senior Accountant"), informed Horowitz that thousands of prescriptions reflected in Medly's financial statements as revenue Medly had earned had, in fact, not actually been filled by Medly or delivered to patients, and warned that Medly may be overstating its revenue.

95.     In February 2021, the FP&A Senior Analyst met with Patel and Horowitz concerning the BI Team's revenue overstatements and provided Patel with an example of how the BI Team reports had led to incorrect revenue recognition.

96.     Following that meeting, Horowitz told the FP&A Senior Analyst that Patel believed the FP&A Senior Analyst had been "digging too much" into the discrepancies between the BI Team reports and Medly's raw financial data.

97.     Also in or around February 2021, Horowitz acknowledged that his direct reports on Medly's FP&A and accounting teams understood Medly's financial statements were inaccurate and he directed the Senior Accountant—who had expressed concerns to Horowitz about the accuracy of financial statements provided to Medly's Board and investors—to track

what Medly employees believed were Medly's accurate financial numbers, including revenue, separate from the financial statements shown to Medly's Board.

98.    On March 2, 2021, Horowitz emailed both the Senior Accountant and Medly's Head of FP&A ("Head of FP&A"), expressly acknowledging "Revenue Concerns." In the email, Horowitz described his concern that Medly's revenue numbers were inaccurate, that he had discussed this concern with Patel more than six weeks earlier, and had recommended to Patel that Medly "look to restate revenues based on these find[ing]s"—that is, that Medly revise prior financial statements to correct the amount of revenue it had earned.

99.    In that same email, Horowitz wrote,

> The guidance I received from [Patel] was to stop and not alarm the team. He had requested we continue with this accounting practice until our Series C fund raise was completed. His concern was that we did not "fully understand" the impacts of our hypothesis and that we should not further "explore" or "spend effort analyzing" this potential issue until Q2 2021.

100.    In the email, Horowitz directed the Head of FP&A and the Senior Accountant to have their teams continue to analyze Medly's revenue overstatement, although both the Head of FP&A and the Senior Accountant believed Horowitz's email and instruction were self-serving attempts by Horowitz to create a paper trail to avoid blame or liability if something with Medly went awry.

101.    The next day, the FP&A Senior Analyst, advised Horowitz that Medly's lack of leadership with respect to its accounting had created a "financial reporting risk" and "incomplete data," and the risk that Medly's use of "old, inaccurate data will lead to ill-informed business decisions."

102.    Also in March 2021, the Senior Accountant identified several conclusions the Senior Accountant had reached based on an investigation into the accuracy of Medly's

financials, including that Medly's leadership (*i.e.*, Patel and Horowitz) had "an apparent disregard for the integrity of our books and financial reporting" and noting their "reluctance to investigate and disclose a material misstatement in our revenue while fundraising." That month, after sharing these conclusions with Horowitz, the Senior Accountant resigned.

103.    In May 2021, the FP&A Senior Analyst again told Horowitz that Medly was continuing to overstate its revenue in material amounts, including because its financial statements reflected incorrect assets on its balance sheet: money supposedly owed to Medly for prescriptions that was not actually owed and that Medly would not receive.

## IV.    PATEL AND HOROWITZ RAISED FUNDS USING FALSE AND MISLEADING FINANCIAL STATEMENTS

104.    After Medly employees uncovered and identified significant inaccuracies in Medly's revenue and accounts receivable, and informed Patel and Horowitz of those issues, Patel and Horowitz marketed and then closed Medly's largest ever fundraising round, its Series C fundraise—and Patel and Horowitz used false and misleading financial statements to do so.

105.    Medly began marketing the Series C fundraise in or around October 2020. The Series C fundraise had two closes, the first between May 2021 and February 2022, and a second close between July and August 2022.

106.    During the first close of the Series C round, Medly sold preferred equity shares, in a private placement, to outside accredited investors for more than $164 million.

107.    During the second close of the Series C round, Medly sold additional preferred equity shares, also in a private placement, to outside accredited investors for more than $7 million.

108.    Based on the Series C round, Medly's valuation was approximately $925 million—growth of more than 240 percent from its May 2020 fundraise.

109.    Before investors participated in the Series C fundraise, Patel and Horowitz made and disseminated false and misleading statements to them about Medly's financial performance, including about revenue Medly had purportedly earned, but which it had not, in fact, earned. Patel and Horowitz each knew or recklessly disregarded that these statements were false and misleading.

**A.    Patel and Horowitz Had Critical Roles in the Series C Fundraise.**

110.    As Medly's CEO and CFO, Patel and Horowitz led Medly's Series C fundraise and each had critical roles with respect to that fundraise.

111.    Beginning in October 2020, Patel and Horowitz devised the strategy for Medly's Series C fundraise, each participating in no fewer than tens of internal meetings with each other and with Medly's various employee teams—including the FP&A team, accounting team, operational teams, and the BI Team—concerning the forthcoming fundraise. Patel and Horowitz also spent substantial time drafting and revising presentations to be made to potential investors.

112.    Both Patel and Horowitz drafted, edited, approved, and finalized data and forecasts detailing Medly's financial and operational performance for firms that were considering investments in Medly. And both Patel and Horowitz conveyed that information to potential investors.

113.    At Medly, financial statements and forecasts, including those provided to potential equity and debt investors and other sources of financing, were typically created pursuant to the following process:

        a.    FP&A and accounting personnel reporting to and directed by Horowitz, collected, compiled, and analyzed data concerning aspects of Medly's business performance. This included, among other examples, general

ledger entries and data concerning Medly's sales, expenses, reversals, commissions, and inventory and costs of goods sold.

b.    Those FP&A and accounting personnel then shared their work product with Horowitz, including in the form of balance sheets, income statements, consolidated financial statements, or components thereof.

c.    Then, Horowitz reviewed and refined that work product, including by making so-called "top side" adjustments, where Horowitz (or others at his direction and often in consultation with Patel) would make ad hoc adjustments to the top line numbers in Medly's financial statements.

d.    Sometimes, Horowitz finalized and shared the financial statements with third parties without input from Patel.  In other instances, Horowitz shared the draft financial statements with Patel and both Horowitz and Patel finalized the financial statements together, or Patel finalized and the financial statements and shared them with third parties.

The false and misleading statements about Medly's financial performance that Patel and Horowitz sent to Series C investors, explained in more detail *infra*, generally followed this process.

114.    Patel and Horowitz were Medly's primary representatives to potential investors for the Series C fundraise and potential investors looked to Patel and Horowitz to provide them with accurate information about Medly.

115.    Both Patel and Horowitz communicated directly with potential investors— including through numerous emails, telephone calls, and meetings—to pitch investments in Medly and to answer questions about Medly and its operational and financial performance.  In

2021 alone, Patel and Horowitz each exchanged hundreds of emails with potential investors (or representatives of those investors), communicating with them on at least a weekly basis, to provide information about Medly.  In that time, Patel also met with potential or actual investors (or their representatives) well over 50 times, and Horowitz had at least 25 such meetings.

**B.**    **In May 2021, Medly Obtained Nearly $113 Million From Outside Investors.**

116.    On May 27, 2021, as part of the first close of its Series C fundraise, Medly raised nearly $113 million from four outside investors—Investor A, Investor B, Investor C, and Investor D.

117.    Despite that Patel and Horowitz each knew, or recklessly disregarded, that Medly's financial statements materially overstated Medly's financial performance, both Patel and Horowitz conveyed that information to those four Investors—and caused that information to be disseminated to them—making false and misleading statements to each of them, including concerning Medly's revenue, revenue growth, and profitability.

118.    Patel and Horowitz ultimately decided what information about Medly they would send to prospective investors.  And both Patel and Horowitz knew or recklessly disregarded that what they chose to convey to prospective investors was false and misleading.

*i.*    *Investor A Invested $12.5 Million in Medly Based on*
       *False and Misleading Financial Information.*

119.    By no later than April 2021, Investor A was evaluating whether to participate in the Series C fundraise with another investment in Medly.  In connection with Investor A's evaluation of a potential investment, Patel and Horowitz each conveyed information about Medly to Investor A, in meetings, phone calls, and emails.

120.    In April 2021—after the FP&A Senior Analyst told Horowitz of specific and material revenue misstatements in Medly's financial statements and warned Horowitz not to

raise funds based on those numbers, and after Horowitz had acknowledged that Medly's financial statements were incorrect and recommended to Patel that Medly restate its financial numbers, *see supra* paragraphs 91-103, Horowitz made false and misleading statements to Investor A concerning Medly's revenue and profitability.

121.    On April 21, 2021, Horowitz met with Investor A to answer questions related to a potential investment in Medly.  Following that meeting, Investor A repeatedly asked Horowitz to provide data about Medly's financial performance.

122.    On April 22, 2021, Horowitz told Investor A, "Please excuse the delay, I was attempting to have firmer March 2021 numbers from the accounting team," and Horowitz sent information about Medly's financial performance and assets to Investor A.  That information was false and misleading, as Horowitz knew or recklessly disregarded.

123.    According to the data Horowitz sent to Investor A, Medly earned more than $211 million in gross revenue and more than $32 million in gross profit between January 2020 and January 2021.  These numbers also suggested that Medly had achieved year-over-year revenue growth from 2019 to 2020 of approximately 114 percent.

124.    In truth, during that period, Medly had earned less than $189 million—*i.e.*, more than ten percent less than Horowitz had represented and which was a discrepancy that equaled two-thirds of Medly's purported gross profit.  Additionally, Medly had actually achieved year-over-year revenue growth from 2019 to 2020 that was approximately 23 percent lower than the data sent by Horowitz suggested.

125.    Horowitz did not disclose to Investor A that he believed Medly's revenue was materially overstated or that he knew that Medly senior employees had identified specific and material overstatements in Medly's revenue, profitability, and assets.

126.    Investor A viewed the revenue numbers from Horowitz, the accuracy of those numbers, and the fact that Horowitz was purportedly fully disclosing Medly's financial performance to date as important to its decision to participate in the Series C fundraising round.

127.    In May 2021, Investor A, relying on the false and misleading financial information that Horowitz provided, invested $12.5 million in Medly's Series C fundraising round.

        *ii.*      ***Investor B Invested $1 Million in Medly Based on False and Misleading Financial Information.***

128.    By no later than February 2021, Investor B was also considering participating in the Series C fundraise with an additional investment in Medly.  Patel led Medly's responses to Investor B's questions in connection with that potential investment.

129.    In April 2021—after Horowitz told Patel that Medly's financial statements were inaccurate and should be restated, after the FP&A Senior Analyst provided Patel with a specific example of how Medly's had improperly recognized revenue, and after Patel told Horowitz that the FP&A Senior Analyst was "digging too much" into Medly's revenue discrepancies—Patel made false and misleading statements to Investor B concerning Medly's revenue and profitability.

130.    On April 20, 2021, Patel met with Investor B to answer questions related to a potential investment in Medly.  Following that meeting, Investor B asked Patel to provide data about Medly's financial performance.

131.    As part of responding to Investor B's requests, Patel obtained Medly financial statements from Horowitz, which both Patel and Horowitz knew or recklessly disregarded were inaccurate.  (And which Horowitz knew Patel would provide to third parties.)

132.    On April 23, 2021, Patel sent information about Medly's financial performance and assets, obtained from Horowitz, to Investor B.

133.    According to the data Patel delivered to Investor B, Medly earned more than $211 million in gross revenue and more than $32 million in gross profit between January 2020 and January 2021.  The data also suggested that Medly had achieved year-over-year revenue growth from 2019 to 2020 of approximately 114 percent.

134.    That information was false and misleading, as Patel knew or recklessly disregarded.  In truth, during that period, Medly had earned less than $189 million in revenue—*i.e.*, more than ten percent less than Patel had represented and which was a discrepancy that equaled two-thirds of Medly's purported gross profit.  Additionally, Medly had actually achieved year-over-year revenue growth from 2019 to 2020 that was approximately 23 percent lower than the data sent by Patel suggested.

135.    Patel did not disclose to Investor B that he knew or recklessly disregarded that Medly's revenue was overstated, that Medly senior employees had identified overstatements in Medly's revenue to Patel, or that Patel had instructed Medly employees to stop investigating those overstatements and continue with Medly's existing accounting practices until Medly completed its Series C fundraise.

136.    For Investor B, the revenue numbers that Patel provided, the accuracy of those numbers, and the fact that Patel was purportedly fully disclosing Medly's financial performance to date were important to its decision to participate in the Series C fundraising round.

137.    In May 2021, Investor B, relying on the false and misleading financial information that Patel provided, invested approximately $1 million in Medly's Series C fundraise.

### iii. Investor C Invested $20 Million in Medly Based on False and Misleading Financial Information.

138.    Between November 2020 and May 2021, Investor C evaluated whether to participate in the Series C fundraise with an additional investment in Medly.  During that time, both Patel and Horowitz conveyed information about Medly to Investor C, in meetings, phone calls, and emails, to assist with Investor C's evaluation of a potential investment.

139.    On November 12, 2020, after Medly began marketing its Series C fundraise, Horowitz sent Investor C a deck concerning Medly saying that, between January and September 2020, Medly had earned more than $129 million in revenue and that Medly had missed its revenue budget projection by only $20 million or 13 percent.

140.    As Horowitz knew or recklessly disregarded, those numbers were false and misleading.  In fact, Medly had missed its revenue budget projections by more than $34 million or approximately 23 percent. And while the numbers from Horowitz said that Medly's year-over-year revenue growth for that period was 120 percent, it was actually under 100 percent.  (For venture and growth investors, like Medly's prospective and actual investors, this difference in growth rates was significant.)

141.    As Horowitz admitted to Medly's accountant weeks later, *supra* paragraph 87, he believed that Medly's revenue numbers—which had been included in the data that Horowitz provided to Investor C—could be overstated by as much as twenty percent.

142.    In May 2021, Horowitz again sent financial information to Investor C that Horowitz knew or recklessly disregarded was false and misleading because it overstated Medly's financial performance.

143.    On May 3, 2021, Horowitz sent information about Medly's financial performance and assets to Investor C's representative and agent, an entity assisting Investor C with its

evaluation of Medly as an investment.  According to that data from Horowitz, between January 2020 and January 2021, Medly had earned more than $211 million in gross revenue and more than $32 million in gross profit.  These numbers also suggested that Medly had achieved year-over-year revenue growth from 2019 to 2020 of approximately 114 percent.

144.    In truth, during that period, Medly had earned less than $189 million—*i.e.*, more than ten percent less than Horowitz had represented, and which was a discrepancy that equaled two-thirds of Medly's purported gross profit.  Additionally, Medly had actually achieved year-over-year revenue growth from 2019 to 2020 that was approximately 23 percent lower than the data sent by Horowitz suggested.

145.    Horowitz did not disclose to Investor C that he believed Medly's revenue was materially overstated or that he knew that Medly senior employees had identified specific and material overstatements in Medly's revenue and profitability.

146.    Investor C viewed the revenue numbers from Horowitz, the accuracy of those numbers, and the fact that Horowitz was purportedly fully disclosing Medly's financial performance to date as important to its decision to participate in the Series C fundraising round.

147.    In May 2021, Investor C, relying on the false and misleading financial information Horowitz provided, invested $20 million in Medly's Series C fundraise.

### iv.    *Investor D Invested $79 Million in Medly Based on False and Misleading Financial Information.*

148.    Beginning in December 2020, Investor D began considering investing in Medly's Series C fundraise.  While Patel led the efforts to persuade Investor D to invest in Medly, Horowitz also communicated with Investor D repeatedly and met with Investor D as part of Investor D's evaluation of a potential investment in Medly.

149.     In mid-February 2021, Investor D provided Patel with a list of information it needed to consider investing in Medly, including "historical financials for the last two years." As part of responding to Investor D's requests, Patel obtained Medly financial statements from Horowitz, which both Patel and Horowitz knew or recklessly disregarded were inaccurate.  (And which Horowitz knew Patel would provide to third parties.)

150.     On February 24, 2021, Patel sent information about Medly's financial performance and assets to Investor D, which Patel knew or recklessly disregarded was false and misleading.  According to the data Patel sent, Medly had earned nearly $190 million in gross revenue and nearly $32 million in gross profit between January 2020 and December 2020.  The data also suggested that Medly had achieved year-over-year revenue growth from 2019 to 2020 of approximately 113 percent.

151.     In truth, during that period, Medly had earned less than $169 million—*i.e.*, more than ten percent less than Patel had said—more than $20 million less than Patel had represented, and which was a discrepancy that equaled two-thirds of Medly's purported gross profit.  Additionally, Medly's revenue growth from 2019 to 2020 was actually less than 90 percent, far less than Patel (and Horowitz via Patel) had suggested.

152.     Patel did not disclose to Investor D that he knew or recklessly disregarded that Medly's revenue was overstated, that Medly senior employees had identified overstatements in Medly's revenue to him, or that he had instructed Medly employees to stop investigating those overstatements until Medly completed its Series C fundraise.

153.     For Investor D, the data sent by Patel, the accuracy of Medly's revenue numbers, and the fact that Patel was purportedly fully disclosing Medly's financial performance to date were important to its decision to participate in the Series C fundraising round.

154.    In May 2021, Investor D, relying on the false and misleading information from Patel and Horowitz, invested approximately $79 million in Medly's Series C fundraise.

155.    By raising funds in the Series C round, Medly—a resource-intensive business that was burning through cash but that needed to create the appearance that it was growing exponentially—was able to continue to operate; to pay salaries and bonuses to Patel, Horowitz, and Bhatt, and allow them to stay employed; and to increase the value of the Medly securities that Patel, Horowitz, and Bhatt owned.

**C.    Medly Personnel Continue to Highlight Inaccuracies in Medly's Financials.**

156.    After Medly obtained nearly $113 million from Investors A, B, C, and D, described *supra*, Horowitz's direct reports continued to tell him and Patel that Medly's financials materially overstated Medly's revenue.  Yet, Patel and Horowitz continued to use data that falsely inflated Medly's financial performance to raise money from investors.

157.    For example, in May 2021, an individual who is a Certified Public Accountant and Certified Internal Auditor joined Medly to lead its accounting team ("Head of Accounting"). Soon thereafter, the Head of Accounting identified significant inaccuracies in Medly's revenue. Yet, the Head of Accounting found that they could not obtain critical information from the BI Team related to aspects of those inaccuracies.

158.    In August 2021, the Head of Accounting contacted the Ethics Hotline of the Association of International Certified Professional Accountants ("AICPA"), a professional accountants association, to seek advice.  AICPA advised the Head of Accounting to try to correct the revenue overstatement and, if unable to do so, to resign from the company.

159.    The Head of Accounting reported to Horowitz their "major concern" that revenue was incorrect.  Then, in October 2021, the Head of Accounting reported to Patel their concern that Medly had not corrected the company's historical revenue overstatements, including because

of obfuscation by the BI Team, and that the amounts Medly needed to restate were significant, telling Patel specifically that the revenue "restatements will be material to the shareholders, once we determine the actual amounts based on [the BI Team's] work."

160.    Days later, the Head of Accounting emailed Patel, Horowitz, and the head of the BI Team, to emphasize that Medly had failed to correct overstated revenue numbers in its financial statements,

> I'm starting to feel anxious about the amount of time this is taking, and worried about the ramifications that come from not fixing such an important issue on a timely basis—frankly, we have been working on this since last April, and I feel like the deadline has been pushed dozens of times.  This is concerning, due to the material and otherwise potentially important disclosure to investors based on this issue which we still need to vet and finalize.

161.    The Head of Accounting continued to investigate and confirm the existence of accounting discrepancies in Medly's financial statements in the following months and repeatedly contacted Patel about Medly's "large" and "unresolved" revenue overstatements.  When Patel and Horowitz failed to address those issues, the Head of Accounting resigned.

162.    During the time the Head of Accounting was repeatedly identifying Medly's revenue overstatements to both Patel and Horowitz, the FP&A Senior Analyst was also identifying specific inaccuracies in Medly's revenue.

163.    For example, the FP&A Senior Analyst prepared a written analysis of discrepancies between revenue actually earned by two of Medly's busiest pharmacy locations, on the one hand, and reports provided by the BI Team for those locations, on the other hand, demonstrating how the BI Team had overstated revenue earned at those locations between January 2020 and June 2021 by more than $25 million.  In August 2021, the FP&A Senior Analyst provided that analysis to Horowitz and others.

164.    Horowitz did not dispute the analysis; rather, he told the FP&A Senior Analyst that Medly would need to incorporate the analysis into Medly's forecasting model and asked the FP&A Senior Analyst to expand the analysis to all Medly locations.  Even then, however, neither Horowitz nor Patel told existing or potential investors of Medly's misstated revenue, revenue growth, and profitability.

165.    In December 2021, Medly's Accounts Receivable Manager performed a similar analysis and confirmed to Horowitz in writing what the FP&A Senior Analyst had said many months earlier:  Medly was overstating its revenue by millions of dollars.

166.    At all times, the information and data that Medly's FP&A and accounting teams used to identify overstatements in Medly's revenue, revenue growth, and profitability were equally available to Medly's seniormost executives, Patel and Horowitz.

**D.    Between July 2021 and December 2021, Medly Obtained An Additional Approximately $45 Million From Outside Investors.**

167.    Between July and December 2021, also as part of the first close of the Series C fundraise, Medly raised an additional nearly $45 million from investors, including Investor A and Investor D, each of which added to existing investments, and Investor E, Investor H, and Investor I, which became Medly investors.

168.    Before those investments, and notwithstanding that Patel and Horowitz each knew, or recklessly disregarded, that Medly's financial statements materially overstated Medly's financial performance, both Patel and Horowitz conveyed that information to those Investors—and caused that information to be disseminated to them—making false and misleading statements to each of them, including concerning Medly's revenue, revenue growth, and profitability.

169.     Patel and Horowitz ultimately decided what information about Medly they would send to prospective investors.  And both Patel and Horowitz knew or recklessly disregarded that what they chose to convey to prospective investors was false and misleading because it overstated Medly's financial performance.

### i.     Investor E Invested Nearly $10 Million in Medly Based on False and Misleading Financial Information.

170.     In January 2021, Investor E began considering investing in Medly's Series C fundraise.  Both Patel and Horowitz conveyed information about Medly to Investor E, in meetings, phone calls, and emails, to assist with Investor E's evaluation of a potential investment in Medly.

171.     On or around February 8, 2021, Patel met with the partnership of Investor E to provide information, and answer questions, about Medly.  Patel then arranged for Investor E to meet with Medly employees to further evaluate a potential investment.

172.     On March 1, 2021, Investor E asked Patel to provide additional information about Medly's business operations.  As part of responding to Investor D's requests, Patel obtained Medly financial statements from Horowitz, which both Patel and Horowitz knew or recklessly disregarded were inaccurate.  (And which Horowitz knew Patel would provide to third parties.)  Patel then sent that information, including information about Medly's financial performance and assets, to Investor D.

173.     Like the false and misleading data provided to Investor A, Investor B, and Investor C, described above, *supra* paragraphs 123 to 124, 133 to 134, and 142 to 143, the data Patel sent to Investor E overstated Medly's 2020 revenue by at least $20 million and overstated Medly's annual revenue growth by approximately 23 percent.

174.    Patel did not disclose to Investor E that he knew or recklessly disregarded that Medly's revenue was overstated, that Medly senior employees had identified overstatements in Medly's revenue to him, or that he had instructed Medly employees to stop investigating those overstatements and continue with Medly's existing accounting practices until Medly completed its Series C fundraise.

175.    For Investor E, the data sent by Patel, the accuracy of Medly's revenue numbers, and the fact that Patel was purportedly fully disclosing Medly's financial performance to date were important to its decision to participate in the Series C fundraising round.

176.    In July 2021, Investor E, relying on the false and misleading information from Patel and Horowitz, invested nearly $10 million in Medly's Series C fundraise.

### ii.    *Investor A and Investor D Invested an Additional Nearly $20 Million in Medly Based on False and Misleading Financial Information.*

177.    In mid-2021, both Investor A and Investor D were considering additional investments in Medly's Series C fundraise.  During that time, both Patel and Horowitz conveyed information about Medly to Investor A (and to an entity that was considering investing in Medly through Investor A) and Investor D, in meetings, phone calls, and emails, to assist with Investor A and Investor D's evaluation of a potential investment.

178.    On June 8, 2021, Investor A asked Horowitz to provide financial information about Medly, saying, "It's imperative we receive your January through April financials as soon as possible."  Within an hour of the request, Horowitz finalized a form of Medly's financial statements and sent that data to Investor C, with a carbon copy to Patel.  Both Horowitz and Patel knew or recklessly disregarded that this information was false and misleading because it overstated Medly's financial performance.

179.    According to the data Horowitz sent to Investor A, Medly had earned $21.5 million in revenue in January 2021, representing year-over-year growth for that month of nearly 80 percent.  In truth, that revenue number was overstated by nearly ten percent and the financials Horowitz provided suggested that Medly's growth rate for the month was approximately 24 percent higher than if Horowitz had provided Medly's correct January 2021 revenues.  Those financials also overstated Medly's revenue for April 2021 and its year-over-year growth for that month in similar amounts.

180.    In July 2021, Horowitz also provided false and misleading information about Medly to Investor D.  Specifically, on or around July 27, 2021, Investor D asked Horowitz for Medly's "Q1 Actual financials."  After receiving that request, Horowitz asked the Senior Accountant to provide him with Medly financial data for that period.  Then, on July 28, 2021, Horowitz sent Investor D information about Medly's purported financial performance for the first quarter of 2021, which Horowitz knew or recklessly disregarded was false and misleading because it overstated Medly's financial performance.

181.    Like the data that Horowitz had sent to Investor A, *supra* paragraph 178, the financial information that Horowitz send to Investor D overstated Medly's revenue for both January 2021 and April 2021 by nearly ten percent and overstated Medly's year-over-year growth for those months by more than twenty percent.

182.    Horowitz did not disclose to either Investor A or Investor D that multiple senior Medly employees had identified material overstatements in Medly's revenue and irregularities in its accounting, that those employees had informed both Patel and Horowitz of those issues, or that Patel had instructed employees not to investigate those issues and continue with Medly's existing accounting practices until Medly's Series C fundraise was completed.

183.    For Investor A and Investor D, the information about Medly's financial performance that Horowitz provided, the accuracy of that information, and the fact that Horowitz was purportedly fully disclosing Medly's financial performance to date were important to their decisions to make additional investments in the Series C fundraising round.

184.    In July 2021, Investor A, relying on the false and misleading information that Horowitz sent, invested an additional approximately $14.7 million in Medly.

185.    Months later, Investor D, also relying on the false and misleading information that Horowitz sent, invested an additional approximately $5 million in Medly.

### iii.    Investor H and Investor I Invested $5 Million in Medly Based on False and Misleading Financial Information.

186.    As part of Medly's Series C fundraise, Patel and Horowitz also solicited and obtained investments from Investor H and Investor I based on information about Medly's financial performance that Patel and Horowitz knew or recklessly disregarded was false and misleading.

187.    Investor H provided Medly with debt financing in 2020 and, in connection with that financing, obtained the right to buy Medly preferred stock in Medly's Series C fundraise.

188.    In May 2021, Investor H asked Horowitz to provide information concerning Medly's financial performance. In response, Horowitz sent Investor H information about Medly's purported financial performance that Horowitz knew or recklessly disregarded was false and misleading.

189.    On May 14, 2021, and like the false and misleading financial data that Patel and Horowitz had provided to other potential investors, Horowitz sent data to Investor H that inflated Medly's revenue for the period from January 2020 through January 2021 by more than $22 million—an amount that accounted for nearly 70 percent of the "gross profit" that the data said

Medly had supposedly earned during that time—and overstated Medly's year-over-year revenue growth from 2019 to 2020 by more than 20 percent.

190.    In August 2021, relying on the false and misleading information that Horowitz sent, Investor H participated in the Series C round, investing approximately $500,000.

191.    In July and August 2021, Patel also used false and misleading information about Medly's financial performance to solicit and obtain an investment in Medly's Series C round from Investor I.

192.    In May 2021, Investor I began considering a potential investment in Medly's Series C fundraise, and Patel took the lead in soliciting and obtaining that investment, including by meeting with Investor I and providing information to Investor I about Medly.

193.    In July 2021, Investor I requested that Patel make a presentation to the partnership of Investor I and also "send over the financials/the model" regarding Medly's performance. Patel responded, "I will get something over to you by EOW [End of Week]," and subsequently provided Investor I with access to Medly financial data via a data room.

194.    Among other things, Patel provided Investor I with access to a Medly investor deck that had been created by Patel and Horowitz, and direct reports under their supervision, and finalized and approved by Patel and Horowitz.  Investor I then analyzed the deck and discussed it with Patel.

195.    Patel knew or recklessly disregarded that the data he provided to Investor I was false and misleading because it overstated Medly's financial performance.  Indeed, that deck overstated Medly's 2020 revenue by more than $20 million and overstated Medly's quarterly revenue performance for each quarter of 2020 by at least nine percent and by as much as fourteen percent.

196.    In August 2021, relying on the false and misleading information created by Patel and Horowitz and provided by Patel, Investor I invested $4.5 million in Medly's Series C fundraise.

197.    Before the investments by Investor H and Investor I, neither Patel nor Horowitz disclosed to those Investors that multiple senior Medly employees had discovered overstatements in Medly's revenue and irregularities in its accounting, that those employees had informed both Patel and Horowitz of those issues, that Patel had instructed employees not to investigate those issues and continue with Medly's existing accounting practices until Medly's Series C fundraise was completed, and that both Patel and Horowitz knew or recklessly disregarded that Medly's revenue was overstated.

**E.    Medly Employees Discovered Bhatt's Fake Prescriptions.**

198.    Between November 2021 and January 2022, Medly employees uncovered hundreds of fake prescriptions that, unbeknownst to them, Bhatt had created and that had resulted in millions of dollars of supposed revenue, and Patel learned of those employees' discoveries.

199.    In November 2021, Medly's Accounts Receivable Manager reported to Horowitz identified that Medly's accounts receivable included many claims by Medly to health insurance companies for large dollar prescriptions that were associated with a single BIN number ("BIN A"). The Accounts Receivable Manager then discovered that some patients associated with these claims had been marked as deceased within Medly's records. By January 2022, the Accounts Receivable Manager discovered similar unusual prescription claims associated with another BIN number ("BIN B").

200.    The fake prescriptions that the Accounts Receivable Manager had identified, and which Medly had supposedly billed to health insurance companies associated with BIN A and BIN B, had accounted for at least $13 million of Medly's purported revenue.

201.    In mid-December 2021, shortly after Bhatt learned that Medly's accounting team raised questions about BIN A, he logged into PrimeRx and changed the fake patient data for numerous claims associated with that BIN number so that the claims were no longer tied to it and would be more difficult for other Medly employees to identify.  As one example, Bhatt moved some claims to new, fake patient profiles and associated them with BIN B or other health insurance companies.

202.    On January 4, 2022, after emails to Bhatt from other Medly FP&A and accounting employees had gone unanswered, Medly's Head of Accounting told Bhatt that claims to BIN A and BIN B had raised "serious concerns."  Bhatt emailed both the Head of Accounting and Patel acknowledging the issue, but then tried to further conceal the fraudulent data by logging into PrimeRx and deleting fake patient profiles and claims related to BIN A and BIN B.

**F.    In February 2022, Medly Obtained Millions of Additional Dollars From Outside Investors.**

203.    In late 2021 and early 2022, Patel continued to solicit investments in Medly as part of the Series C round, using false and misleading Medly financials to do so.

204.    For example, in December 2021, Patel met with Investor G about investing in Medly and provided a deck purportedly showing Medly's quarterly performance and revenue growth from the third quarter of 2017 through the third quarter of 2021.  This deck misrepresented Medly's 2020 and 2021 performance, which Patel knew or recklessly disregarded.  Like the information that Patel and Horowitz had sent to other potential Series C investors, the deck overstated Medly's revenue for 2020, inflating Medly's revenue for every

quarter of 2020 by at least eight percent and as much as twelve percent. The deck also overstated Medly's 2021 third quarter revenue by more than 33 percent.

205. Patel did not disclose to Investor G that multiple senior Medly employees had discovered overstatements in Medly's revenue and irregularities in its accounting, that Patel had been informed of those issues, that he had instructed employees not to investigate those issues and continue with Medly's existing accounting practices until Medly's Series C fundraise was completed, or that Patel knew or recklessly disregarded that Medly's revenue was overstated.

206. For Investor G, the revenue numbers that Patel provided, the accuracy of those numbers, and the fact that Patel was purportedly fully disclosing Medly's financial performance to date were important to its decision to participate in the Series C fundraising round. In February 2022, Investor G invested over $6.8 million in that round.

**G.     In July and August 2022, Medly Obtained an Additional More Than $7 Million From Outside Investors.**

207. In July and August 2022, Medly sought to raise additional funds from outside investors in the second close of its Series C fundraising round, including additional investments from existing investors. In that close, Medly ultimately obtained more than $7 million, including from Investor A, Investor C, Investor D, Investor E, Investor F, and Investor G.

208. Before those investments—and during the time that Medly was marketing its Series C fundraising round but after specific issues regarding Medly's overstated revenue had been repeatedly communicated to Patel and Horowitz—Patel and/or Horowitz made false and misleading statements to those six Investors, and sent false and misleading financial data to them, including concerning Medly's revenue, revenue growth, and profitability.

209. Patel and Horowitz ultimately decided what information about Medly they would send to prospective investors. And both Patel and Horowitz knew or recklessly disregarded that

what they chose to convey to prospective investors was false and misleading because it overstated Medly's financial performance.

i.    *Investor A, Investor C, and Investor D Invested an Additional $5 Million in Medly Based on False and Misleading Financial Information.*

210.    In September 2021, Investor A asked Horowitz for updated details concerning Medly's financial performance. On September 7, 2021, Horowitz, as he had done previously, *supra* paragraphs 121 to 124, sent Investor A financial data that overstated Medly's revenue for 2020 by more than $20 million and overstated Medly's annual revenue growth for 2020 by approximately 23 percent.

211.    In October 2021, when Investor C was considering another investment in Medly's Series C fundraising round, Horowitz sent Investor C a Medly financial report titled, "CFO Quarterly Information Form" that purported to describe Medly's financial and operational performance for the full year of 2020 and the first three quarters of 2021. Horowitz knew, or recklessly disregarded, that the information was false and misleading because it overstated Medly's financial performance.

212.    Among other things, the "CFO Quarterly Information Form" inflated Medly's revenue for the six quarters from January 2020 and June 2021 by more than $25 million. Had that amount not been included in the purported revenue set forth in the "CFO Quarterly Information Form" sent by Horowitz, then Medly's losses for that period would have increased from approximately $47 million to more than $70 million, an increase of nearly 50 percent.

213.    Then, before Medly's November 2021 Board meeting, Patel sent the Board and Board observers—including Investor A, Investor C, and Investor D—a deck that both Patel and Horowitz, and direct reports under their supervision, had created. That deck also overstated

Medly's 2020 revenue by inflating Medly's quarterly revenue for every quarter of 2020 by at least nine percent and as much as fourteen percent.

214.    On April 5, 2022, Patel sent Investor C and Investor D a deck purporting to reflect Medly's latest financial performance.  Patel and Horowitz, and direct reports under their supervision, also created this deck and it inflated both Medly's January 2022 and February 2022 revenue, overstating the February revenue by more than $4.6 million or nearly fourteen percent.

215.    In early July 2022, Investor A asked Patel for an investor presentation and, on July 6, 2022, Patel sent a deck to Investor A that continued to inflate Medly's revenue.  The deck said that Medly had earned nearly $190 million in revenue in 2020 and nearly $350 million in revenue in 2021 (including revenue earned by the retail pharmacy chain Medly had acquired).  This overstated Medly's 2020 and 2021 revenue by a total of at least $35 million.

216.    Patel and Horowitz knew or recklessly disregarded that the financial statements they had provided to Investor A, Investor C, and Investor D were inaccurate.  Neither Patel nor Horowitz disclosed to those Investors that senior Medly employees had discovered overstatements in Medly's revenue and irregularities in its accounting and had reported those issues to Patel and Horowitz, that Patel had instructed employees to not investigate those issues until Medly's Series C fundraise was completed, or that Patel and Horowitz knew or recklessly disregarded that Medly's revenue was overstated.

217.    In July and August 2022, after receiving the inaccurate financial information from Patel and Horowitz in late 2021 and early 2022, Investor A, Investor C, and Investor D all invested in the second close of Medly's Series C fundraising round, investing $600,000, $1 million, and $3.4 million, respectively.

218.     As with their earlier investments, Investor A, Investor C, and Investor D viewed the revenue numbers from Patel and Horowitz, the accuracy of those numbers, and the fact that Patel and Horowitz were purportedly fully disclosing Medly's financial performance to date as important to their decisions to invest further in Medly

> ### i.     Investor E, Investor F, and Investor G Invested an Additional $1 Million in Medly Based on False and Misleading Financial Information.

219.     Horowitz and Patel also deceived Investor E and Investor F with false and misleading financials that overstated Medly's financial performance.

220.     In August 2021, Horowitz sent those two Investors financial data for Medly, which Patel had reviewed in advance, that overstated Medly's revenue from January 2020 through July 2021 by more than $24 million or 7 percent.  The overstatement accounted for more than half of the "gross profit" those financials said Medly had earned during that period.  In May 2022, Patel sent both Investor E and Investor F purportedly updated financials with the same false and misleading information about Medly's supposed revenue.

221.     Relying on those financial statements, Investor E and Investor F both invested $200,000 in the second close of Medly's Series C fundraising round.

222.     Finally, Investor G also invested in the second close of Medly's Series C fundraise based on false and misleading financial information from Patel.

223.     As noted above, in January 2022, Patel sent false and misleading financial information to Investor G that overstated Medly's financial performance, *supra* paragraph 204, including by overstating Medly's quarterly revenue for each quarter of 2020, including overstatements of quarterly revenue by as much as fourteen percent.  Relying on these financial statements, Investor G invested an additional $600,000 in Medly in July 2022 as part of the second close of Medly's Series C fundraise.

224.    As with its prior investment, the revenue numbers that Patel had provided, the accuracy of those numbers and the fact that Patel was purportedly fully disclosing Medly's financial performance to date were important to Investor G's decision to invest further in Medly.

225.    Before their investments in the second close of Medly's Series C round, neither Patel nor Horowitz disclosed to Investor A, Investor C, Investor D, Investor E, Investor F, or Investor G what Patel and Horowitz knew or recklessly disregarded about Medly's myriad accounting problems and fraudulent revenue.

## V.    PATEL AND HOROWITZ MADE ADDITIONAL FALSE AND MISLEADING STATEMENTS TO MEDLY'S BOARD AND BOARD OBSERVERS

226.    Patel's and Horowitz's false and misleading statements to Medly's Board and Board observers, including when those entities were considering participating in Medly's Series C fundraising round, were not limited to overstatements of Medly's revenue and revenue growth. Those misstatements also concerned a loan obtained by Medly in exchange for Medly pledging all of its accounts receivable.

227.    In May 2021, Patel negotiated and caused Medly to enter a contract for a factoring loan, a type of financing in which a business sells their actual or projected accounts receivable or unpaid invoices in exchange for near-term funding.  As part of the loan, Medly sold, or "pledged," all of its accounts receivable to the lender.

228.    Medly had, however, already sold those same accounts receivable to other lenders and Patel had thus caused Medly's receivables to be double-pledged, creating possible cash flow problems for Medly and the potential for a serious default by Medly on its loans.

229.    Horowitz knew about the May 2021 factoring loan at the time and that its terms meant that Medly's accounts receivable were double-pledged.

230.    Neither Patel nor Horowitz disclosed the May 2021 factoring loan to Medly's Board or its existing or potential investors, including to those serving on the Board.  To the contrary, both Patel and Horowitz provided financial statements and reporting to the Board and other outside investors that hid the loan.

231.    For example, in November 2021, while Medly was marketing its Series C fundraise, Patel and Horowitz considered disclosing the factoring loan in a presentation to the Board and the Board observers—which included representatives of several entities that later made additional investments in Medly's Series C, including Investor A, Investor C, Investor D, and Investor E.

232.    Instead, Patel and Horowitz presented Medly's financials in a manner that would conceal the May 2021 factoring loan, which they knew or recklessly disregarded was false and misleading.

233.    In that presentation, Patel and Horowitz deliberately combined the amount of the factoring loan with other Medly debt and labeled it as "A/R Revolver," which made it appear as if Medly had one line of credit, rater than as opposed to multiple lines of credit from multiple lenders.  By lumping the May 2021 factoring loan in with another line of credit, rather than disclosing it to the Board, Patel and Horowitz concealed that Medly's accounts receivable had been double-pledged.

## VI.    AT THE BOARD'S URGING, HOROWITZ WAS DEMOTED

234.    By at least early 2022, Medly investors who also served on Medly's Board were concerned with Horowitz's inadequate explanations about apparent irregularities and discrepancies in Medly's financials.

235.    Given these concerns the Board urged Patel to remove Horowitz as Medly's CFO, and, in April 2022, Patel did so.

236.    However, Patel then moved Horowitz to another supervisory role, as Medly's Executive Vice President of Finance & Accounting and, in that role, Horowitz continued to oversee and direct Medly's FP&A and accounting personnel, and to create, revise, and finalize financial information for the Board and investors.

237.    Although the role was a demotion, Patel increased Horowitz's salary and renegotiated the terms of a $200,000 loan that Medly had previously made to Horowitz to make the terms more favorable to Horowitz, including making the loan forgivable if Horowitz remained employed at Medly until June 2022.  Patel then forgave the loan.

238.    Medly's by-laws required that its Board review and approve loans to employees, like the loan to Horowitz and its amendment, but neither Patel nor Horowitz disclosed to Medly's Board that Patel had caused Medly to loan $200,000 to Horowitz, that Patel modified the terms to favor Horowitz after Horwitz was removed as Medly's CFO, or that Patel forgave the loan—and the Board never approved those actions.

239.    The next month, July 2022, Horowitz resigned from Medly.

## VII.    MEDLY EMPLOYEES UNCOVERED MILLIONS OF DOLLARS OF ADDITIONAL FAKE PRESCRIPTIONS

240.    Between approximately January 2022 and August 2022, several Medly employees discovered and reported to Patel overstatements in Medly's revenue and the fact that Medly had improperly recognized revenue for fake prescriptions.

241.    In early 2022, two Medly regional managers observed what they believed was unusual revenue in several monthly BI Team reports.  In those reports, the regional managers each noted that Medly's revenue appeared to increase substantially in the last few days of each month.  Based on a discussion with Patel in April 2022, one of the regional managers concluded

that at least one of the revenue spikes was designed to cause Medly to appear to meet its monthly revenue target.

242.    Both regional managers investigated the revenue spikes within PrimeRx, and the patient profiles and insurance companies to which the revenue spikes purportedly related.  They determined that the monthly revenue spikes were caused by hundreds of fake prescriptions linked to an insurance code called "EXPINS" and that EXPINS was not associated with a legitimate health insurance company.

243.    In late July 2022, the regional managers informed their supervisor that they had discovered that for the period between January 1 and June 8, 2022, more than 600 prescriptions processed through a single Medly pharmacy location were illegitimate, associated with EXPINS, and had generated millions of dollars in purported revenue.

244.    That supervisor then separately reviewed PrimeRx data and determined that, between November 2021 and July 2022, Medly had recognized more than $67 million in revenue associated with EXPINS.  On July 29, 2022, the supervisor emailed Patel, Medly's General Counsel, and Medly's Chief Compliance Officer ("CCO") about the EXPINS issue, telling them, "something doesn't look right with our revenue numbers."

245.    Subsequently, other employees reviewed PrimeRx and EXPINS-related data and discovered claims for millions of dollars in fraudulent revenue that Medly had recognized in 2021 and 2022.  Those employees pointed Patel and Medly's CCO to these fake prescriptions and revenue issues.  Immediately thereafter, Bhatt deleted hundreds of EXPINS-related prescriptions and changed the insurance codes for other claims to associate them within Medly's systems with legitimate insurance companies.

246.     Despite knowing or recklessly disregarding for years that Medly's revenue had been overstated and having been told about the EXPINS scheme and its further distortion of Medly's actual revenue to the tune of tens of millions of dollars, Patel tried to hide it from the Board.  He told certain of the Board members only that Medly had located some errant prescriptions that had been misbilled and that would affect about $2 million of Medly's profit.

247.     In fact, as Patel knew or recklessly disregarded, Medly's problem was orders of magnitude larger:  it had recognized more than $70 million in fake revenue.

248.     Even after the EXPINS issue was widely known, Patel continued to try to raise funds from investors using the fake revenue numbers, including sending a prospective investor information about Medly that overstated Medly's revenue for 2020 and 2021 by tens of millions of dollars.  That prospective investor decided not to invest.

## VIII.   MEDLY'S BOARD TERMINATED PATEL AND MEDLY ENTERED BANKRUPTCY

249.     On August 18, 2022, Medly's Board informed Patel that it had scheduled a special meeting for the following day.

250.     Patel immediately contacted Medly's drug vendor and renegotiated Medly's existing contract with the vendor—under which Patel had personally guaranteed Medly's debt to the vendor—to cause the vendor to use funds owed to Medly for insurance rebates to pay a portion of Medly's outstanding debt.  Then, the vendor withdrew at least $1.8 million from Medly's credit operating account to pay down Medly's debt.  As a result, Patel personally guaranteed far lower amounts owed by Medly to the vendor.

251.     On August 19, 2022, the Board terminated Patel from Medly.

252.     The Board then retained outside counsel to investigate potentially fraudulent conduct, including Medly's fraudulently inflated revenue.

253.    When that law firm contacted Bhatt in October 2022, he resigned from Medly.

254.    On December 9, 2022, Medly filed for Chapter 11 bankruptcy protection.

255.    Subsequently, Medly sold all of its assets for approximately $19 million, far less than the more than $100 million in debt it owed and a fraction of its purported more than $900 million valuation at the time of its Series C fundraise.

256.    In April 2023, Medly converted its Chapter 11 bankruptcy filing to a Chapter 7 liquidation.

257.    Investors in Medly's Series C fundraise (and all other outside investors in Medly equity and convertible notes) lost the full value of their investments.

## FIRST CLAIM FOR RELIEF
### Violations of Securities Act Section 17(a)
### (Patel and Horowitz)

258.    The SEC re-alleges and incorporates by reference here the allegations in paragraphs 1 through 257.

259.    Patel and Horowitz, directly or indirectly, singly or in concert, in the offer or sale of securities and by the use of the means or instruments of transportation or communication in interstate commerce or the mails, (i) knowingly or recklessly have employed one or more devices, schemes or artifices to defraud, (ii) knowingly, recklessly, or negligently have obtained money or property by means of one or more untrue statements of a material fact or omissions of a material fact necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading, and/or (iii) knowingly, recklessly, or negligently have engaged in one or more transactions, practices, or courses of business which operated or would operate as a fraud or deceit upon the purchaser.

260.    By reason of the foregoing, Patel and Horowitz, directly or indirectly, singly or in concert, have violated and, unless enjoined, will again violate Securities Act Section 17(a) [15 U.S.C. § 77q(a)].

## SECOND CLAIM FOR RELIEF
### Violations of Exchange Act Section 10(b) and Rule 10b-5 Thereunder
### (Patel and Horowitz)

261.    The SEC re-alleges and incorporates by reference here the allegations in paragraphs 1 through 257.

262.    Patel and Horowitz, directly or indirectly, singly or in concert, in connection with the purchase or sale of securities and by the use of means or instrumentalities of interstate commerce, or the mails, or the facilities of a national securities exchange, knowingly or recklessly have (i) employed one or more devices, schemes, or artifices to defraud, (ii) made one or more untrue statements of a material fact or omitted to state one or more material facts necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading, and/or (iii) engaged in one or more acts, practices, or courses of business which operated or would operate as a fraud or deceit upon other persons.

263.    By reason of the foregoing, Patel and Horowitz, directly or indirectly, singly or in concert, have violated and, unless enjoined, will again violate Exchange Act Section 10(b) [15 U.S.C. § 78j(b)] and Rule 10b-5 thereunder [17 C.F.R. § 240.10b-5].

## THIRD CLAIM FOR RELIEF
### Violations of Securities Act Section 17(a)(1) and (3)
### (Bhatt)

264.    The SEC re-alleges and incorporates by reference here the allegations in paragraphs 1 through 245 and 252 through 257.

265.    Bhatt, directly or indirectly, singly or in concert, in the offer or sale of securities and by the use of the means or instruments of transportation or communication in interstate commerce or the mails, (i) knowingly or recklessly has employed one or more devices, schemes or artifices to defraud, and/or (ii) knowingly, recklessly, or negligently has engaged in one or more transactions, practices, or courses of business which operated or would operate as a fraud or deceit upon the purchaser.

266.    By reason of the foregoing, Bhatt, directly or indirectly, singly or in concert has violated and, unless enjoined, will again violate Securities Act Section 17(a)(1) and (3) [15 U.S.C. § 77q(a)(1), (3)].

### FOURTH CLAIM FOR RELIEF
### Violations of Exchange Act Section 10(b) and Rule 10b-5(a) and (c) Thereunder
### (Bhatt)

267.    The SEC re-alleges and incorporates by reference here the allegations in paragraphs 1 through 245 and 252 through 257.

268.    Bhatt, directly or indirectly, singly or in concert, in connection with the purchase or sale of securities and by the use of means or instrumentalities of interstate commerce, or the mails, or the facilities of a national securities exchange, knowingly or recklessly (i) employed one or more devices, schemes, or artifices to defraud, and/or (ii) engaged in one or more acts, practices, or courses of business which operated or would operate as a fraud or deceit upon other persons.

269.    By reason of the foregoing, Bhatt, directly or indirectly, singly or in concert, has violated and, unless enjoined, will again violate Exchange Act Section 10(b) [15 U.S.C. § 78j(b)] and Rules 10b-5(a) and (c) thereunder [17 C.F.R. § 240.10b-5(a) and (c)].

## FIFTH CLAIM FOR RELIEF
### Aiding and Abetting Violations of Securities Act Section 17(a)(2)
### (Bhatt)

270.    The SEC re-alleges and incorporates by reference here the allegations in paragraphs 1 through 245 and 252 through 257.

271.    As alleged above, Patel and Horowitz violated Securities Act Section 17(a)(2) [15 U.S.C. § 77q(a)(2)].

272.    Bhatt knowingly or recklessly provided substantial assistance to Patel and Horowitz with respect to their violations of Securities Act Section 17(a)(2) [15 U.S.C. § 77q(a)(2)].

273.    By reason of the foregoing, Bhatt is liable pursuant to Securities Act Section 15(b) [15 U.S.C. § 77o(b)] for aiding and abetting Patel's and Horowitz's violations of Securities Act Section 17(a)(2) [15 U.S.C. § 77q(a)(2)] and, unless enjoined, Bhatt will again aid and abet these violations.

## SIXTH CLAIM FOR RELIEF
### Aiding and Abetting Violations of Exchange Act Section 10(b) and Rule 10b-5(b)
### (Bhatt)

274.    The SEC re-alleges and incorporates by reference here the allegations in paragraphs 1 through 245 and 252 through 257.

275.    As alleged above, Patel and Horowitz violated Exchange Act Section 10(b) [15 U.S.C. § 78j(b)] and Rule 10b-5(b) [17 C.F.R. § 240.10b-5(b)] thereunder.

276.    Bhatt knowingly or recklessly provided substantial assistance to Bhatt and Horowitz with respect to their violations of Exchange Act Section 10(b) [15 U.S.C. § 78j(b)] and Rule 10b-5(b) [17 C.F.R. § 240.10b-5] thereunder.

277.    By reason of the foregoing, Bhatt is liable pursuant to Exchange Act Section 20(e) [15 U.S.C. § 78t(e)] for aiding and abetting Patel's and Horowitz's violations of Exchange Act

Section 10(b) [15 U.S.C. § 78j(b)] and Rule 10b-5(b) [17 C.F.R. § 240.10b-5(b)] thereunder and, unless enjoined, Bhatt will again aid and abet these violations.

## PRAYER FOR RELIEF

WHEREFORE, the SEC respectfully requests that the Court enter a Final Judgment:

### I.

Permanently enjoining Defendants and their agents, servants, employees and attorneys and all persons in active concert or participation with any of them from violating, directly or indirectly, Securities Act Section 17(a) and Exchange Act Section 10(b) [15 U.S.C. §§ 77q(a) and 78j(b)], and Rule 10b-5 [17 C.F.R. § 240.10b-5].

### II.

Ordering Defendants to disgorge all ill-gotten gains they received directly or indirectly, with pre-judgment interest thereon, as a result of the alleged violations, pursuant to Exchange Act Sections 21(d)(3), 21(d)(5), and 21(d)(7) [15 U.S.C. §§ 78u(d)(3), 78u(d)(5), 78u(d)(7)];

### III.

Ordering Defendants to pay civil monetary penalties under Securities Act Section 20(d) [15 U.S.C. § 77t(d)] and Exchange Act Section 21(d)(3) [15 U.S.C. § 78u(d)(3)];

### IV.

Permanently prohibiting each Defendant from serving as an officer or director of any company that has a class of securities registered under Exchange Act Section 12 [15 U.S.C. § 78l] or that is required to file reports under Exchange Act Section 15(d) [15 U.S.C. § 78o(d)], pursuant to Securities Act Section 20(e) [15 U.S.C. § 77t(e)] and Exchange Act Section 21(d)(2) [15 U.S.C. § 78u(d)(2)]; and

### V.

Granting any other and further relief this Court may deem just and proper.

**JURY DEMAND**

The Commission demands a trial by jury.

Dated: New York, New York
December 31, 2024

_/s/ Antonia Apps_

ANTONIA M. APPS
REGIONAL DIRECTOR
Sheldon L. Pollock
Judith A. Weinstock
Christopher M. Colorado
Suzanne M. Bettis
Heather Marshall Molavi
Attorneys for Plaintiff
SECURITIES AND EXCHANGE COMMISSION
New York Regional Office
100 Pearl Street
Suite 20-100
New York, NY 10004-2616
212-336-9143 (Colorado)
ColoradoCh@sec.gov