UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK
-------------------------------------------------------------- X
                                                               :
SECURITIES AND EXCHANGE COMMISSION                             :
                                                               :
                                         Plaintiff,            :    **MEMORANDUM DECISION**
                                                               :    **AND ORDER**
                      - against -                              :
                                                               :    24-cv-6405 (BMC)
MARG PATEL, ROBERT HOROWITZ, and                               :
CHINTANKUMAR BHATT,                                            :
                                                               :
                                         Defendants.           :
                                                               :
-------------------------------------------------------------- X

**COGAN**, District Judge.

This civil enforcement action presents an unsettled securities-law question amid a pile of more routine issues. In the operative amended complaint, the Securities and Exchange Commission brings securities-fraud claims against one ex-manager and two ex-executives of a now-defunct online pharmacy. It accuses the manager of falsifying sales data to artificially inflate the pharmacy's stated revenue, and it accuses the two executives of raising capital with the artificially inflated revenue statements. The manager and one of the executives have moved to dismiss the claims against them, and the manager has alternatively moved to stay the action pending resolution of a parallel criminal investigation.

For the following reasons, the manager's motion is denied, and the executive's motion is denied in part and granted in part. The amended complaint states redressable claims against the executive for his misstatements, and it states redressable claims against the manager for engaging in a scheme to defraud and for aiding and abetting the executive. There is also no reason to pause the case before a criminal indictment issues. But the Court grants the executive's motion

on the scheme-liability claims because, despite some district court rulings to the contrary, disseminating one's own misstatements cannot alone create scheme liability.

## BACKGROUND

Medly Health, Inc. once held itself out as a disruptor in the pharmaceutical industry. Founded by defendant Marg Patel and his brother in 2017 as a full-service digital pharmacy offering same-day prescription delivery, Medly boasted to investors that it was the "nation's fastest-growing digital pharmacy."  Its financial statements disclosed nine-figure revenues earned by selling prescription medications and receiving payments from patients or their insurance companies.  But by the SEC's account, the reports of Medly's growth were greatly exaggerated.

The story of the alleged exaggerations starts with defendant Chintankumar Bhatt.  Bhatt was Medley's "Head of Rx Operations" during the time relevant to the dispute.  Medly tasked him with, among other responsibilities, intermediating between the Business Intelligence team – a wholly owned India-based subsidiary responsible for Medly's accounting, financial, and data analytics – and Medly's top executives, including its CEO Patel and its CFO, defendant Robert Horowitz.  The three defendants would jointly set periodic revenue targets based on the data compiled and analyzed by the Business Intelligence team, and Bhatt would devise strategies to meet those targets.

Bhatt's strategies, the SEC contends, soon became crooked.  The amended complaint asserts that, from late-2020 to mid-2022, Bhatt entered "hundreds" of fake prescriptions into Medly's pharmacy-management software.  Using his unrestricted access to the software, Bhatt would fabricate patient information, either from whole cloth or by using a deceased patient's

2

profile; record fake prescriptions in the patients' names, often for expensive medications; and then "bill" the prescriptions to non-existent health-insurance companies. This had the predictable effect of ballooning Medly's revenue.

The artificial revenue growth led to an abnormality on Medly's balance sheet: "a substantial and growing debit balance in a Medly expense accrual account that was listed under Medly's Other Current Liabilities ('OCL') line item." Put in simpler terms, an OCL line item typically shows a negative balance (a credit) reflecting short-term debts a company expects to repay, but Medly's OCL showed a positive balance (a debit) reflecting payments that Medly expected to receive. See Adam Hayes, What is Accrual Accounting, and How Does It Work?, Investopedia (May 10, 2025) https://www.investopedia.com/terms/a/accrualaccounting.asp [https://perma.cc/W6WG-Y6Z6]. This makes sense; Bhatt was increasing Medly's revenues without offsetting the usual costs of selling prescriptions. Phony medication sales require no overhead.

An outside investor conducting diligence on Medly noticed the OCL issue and raised it with Patel and Horowitz in November 2020. Horowitz in turn led internal and external investigations into the issue. At a year-end meeting, he reported to Medly's board of directors that Medly had "largely resolved" the OCL issue by reversing around $1.8 million in revenue related to "uncollected copayments" and that he did not expect the inaccuracy to affect Medly's profits.

Shortly before giving his statement to the board, however, Horowitz told an investigating accounting firm that Medly's revenue may be overstated by as much as twenty percent. And shortly after Horowitz's spoke with the board, one of Medly's senior financial analysts gained

access to the raw prescription data, determined that Medly's revenue was overstated, and told Horowitz that Medly could not fundraise based on its stated revenue. A senior accountant also informed Horowitz that "thousands of prescriptions reflected in Medly's financial statements as revenue Medly had earned had, in fact, not actually been filled by Medly or delivered to patients."

A month later, in February 2020, Patel and Horowitz met with the senior analyst. Patel admonished him for "digging too much." Horowitz, more directly, instructed the senior accountant to keep a second set of books tracking what the accountant believed were Medly's accurate financial numbers. In an early-March email to the accountant, Horowitz expressed concerns about Medly's revenue but stated that "the guidance I received from [Patel] was to stop and not alarm the team. He had requested we continue with this accounting practice until our Series C fund raise was completed." That month, after bemoaning Patel and Horwitz's "apparent disregard for the integrity of our books and financial reporting" and their "reluctance to investigate and disclose a material misstatement in our revenue while fundraising," the accountant quit.

Undeterred, Horowitz and Patel used the financial reports to pitch investors. The pitches were, at least initially, quite successful; from May 2021 to August 2022, Medly raised over $170 million in equity, valuing the company at roughly $925 million. But all the while, the walls came crumbling down around defendants. Medly's board, unsatisfied with its CFO's explanations of the OCL imbalance after yet another year of inflated revenue, urged Patel to remove Horowitz in April 2022, and Patel complied. Then, as swaths of employees began to uncover the fake prescriptions, regional managers filed complaints with Medly's Chief

Compliance Officer.  Eventually, the board terminated Patel and launched an internal investigation.  Bhatt resigned shortly afterwards.  Medly filed for bankruptcy and ultimately liquidation.

The SEC brought this enforcement action against defendants, alleging that "Medly created at least $70 million in fake revenue and reported revenue to prospective investors that was fraudulently inflated by between 10 percent and 24 percent."  Its amended complaint asserts six securities-fraud claims premised on three theories of liability.  It seeks to hold Patel and Horowitz directly liable under a prosaic misstatements-and-omissions theory, Horowitz and Bhatt directly liable under a more unconventional scheme-liability theory, and Bhatt secondarily liable for aiding and abetting Horowitz and Patel's fraud.  Horowitz and Bhatt have each moved to dismiss the claims against them, and Bhatt has alternatively moved to stay the action pending the resolution of an ongoing criminal investigation into Medly's demise.

## DISCUSSION

To survive a motion to dismiss, "a complaint must allege sufficient facts, taken as true, to state a plausible claim for relief."  Johnson v. Priceline.com, Inc., 711 F.3d 271, 275 (2d Cir. 2013) (citing Bell Atl. Corp. v. Twombly, 550 U.S. 544, 555-56 (2007)).  Although a court must "accept[ ] as true all material factual allegations in the complaint and draw[ ] all reasonable inferences in plaintiffs' favor[,] . . . . [t]he same deference does not extend . . . to pleaded legal conclusions."  Id. (citing Ashcroft v. Iqbal, 556 U.S. 662 (2009)).  In addition to the allegations in the complaint, a court "may consider any written instrument attached to the complaint, statements or documents incorporated into the complaint by reference, legally required public disclosure documents filed with the SEC, and documents possessed by or known to the plaintiff

5

and upon which it relied in bringing the suit." ATSI Comms. v. Shaar Fund, Ltd., 493 F.3d 87, 98 (2d Cir. 2007).   Where, as here, a plaintiff brings fraud claims, the complaint "must state with particularity the circumstances constituting fraud or mistake."  Fed. R. Civ. P. 9(b).

## I.   Misstatement Liability

Federal securities law primarily rests on dual pillars: the Securities Act of 1933 (the "Securities Act"), which governs the distribution of securities, and the Securities Exchange Act of 1934 (the "Exchange Act"), which governs post-distribution public trading of securities.  See SEC, A Twenty-Five Year Summary of the Activities of the Securities and Exchange Commission 1934-1959 (1961).  Each Act prohibits fraud – the Securities Act in § 17(a) and the Exchange Act in § 10(b) – and the prohibitions "largely mirror each other."  SEC v. Rio Tinto plc, 41 F.4th 47, 49 (2d Cir. 2022).  Both § 17(a) and Rule 10b-5, which implements § 10(b), "consist of a 'misstatement subsection' that is sandwiched between two 'scheme subsections.'" Id.  Section 17(a) provides that

> [i]t shall be unlawful for any person in the offer or sale of any securities (including security-based swaps) or any security-based swap agreement . . .
>
> (1) to employ any device, scheme, or artifice to defraud; or
>
> (2) to obtain money or property by means of any untrue statement of a material fact or any omission to state a material fact necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading; or
>
> (3) to engage in any transaction, practice, or course of business which operates or would operate as a fraud or deceit upon the purchaser.

15 U.S.C. § 77q(a).  Rule 10b-5, which implements § 10(b), provides that

> [i]t shall be unlawful for any person, directly or indirectly, by the use of any means or instrumentality of interstate commerce, or of the mails or of any facility of any national securities exchange,

(a) To employ any device, scheme, or artifice to defraud,

(b) To make any untrue statement of a material fact or to omit to state a material fact necessary in order to make the statements made, in the light of the circumstances under which they were made, not misleading, or

(c) To engage in any act, practice, or course of business which operates or would operate as a fraud or deceit upon any person,

in connection with the purchase or sale of any security.

17 C.F.R. § 240.10b-5.

To state a claim under the misstatement subsection of Rule 10b-5, the SEC must plausibly allege that the defendants "(1) made a material misrepresentation or a material omission as to which [they] had a duty to speak . . .; (2) with scienter; (3) in connection with the purchase or sale of securities." SEC v. Hwang, 692 F. Supp. 3d 362, 377 (S.D.N.Y. 2023). Its burden under § 17(a)'s misstatement subsection is nearly identical, with one difference relevant here: there is no scienter requirement; it need only plead negligence.[1] See Aaron v. SEC, 446 U.S. 680 (1980).

The factual allegations in the amended complaint form a sturdy foundation for misstatement claims under Rule 10b-5 and § 17(a) against Horowitz. According to the SEC, Horowitz provided financial statements to potential investors containing revenue numbers he, at the very least, strongly suspected were inaccurate. He acknowledged that the company may be overstating revenue by 20 percent, the senior analyst corroborated those suspicions after analyzing the raw data, and the head accountant tipped him off to the cause – unfilled

---

[1] Horowitz initially disputed that he obtained "money or property" from the fraud, a requirement unique to § 17(a) claims. See SEC v. DiMaria, 207 F. Supp. 3d 343, 358 (S.D.N.Y. 2016). He then withdrew his argument after the SEC amended its complaint.

prescriptions Medly counted as sold.  Yet, despite all that, he acceded to Patel's demands that they not disturb the revenue figures until after Medly completed its latest fundraising round.

Horowitz's attempts to poke holes in the complaint fall flat.  He does not dispute that the revenue figures were false; that he "made" the misstatements about Medly's revenue, see Janus Cap. Grp., Inc. v. First Derivative Traders, 564 U.S. 135 (2011); or that the misstatements related to the distribution and eventual public trading of Medly's stock. [2]  Instead, he primarily zeros in on scienter and negligence.

Scienter can be established by showing either a "motive or opportunity to commit the fraud" or "strong circumstantial evidence of conscious misbehavior or recklessness."  SEC v. MiMedx Grp., Inc., 2022 WL 902784, at *6 (S.D.N.Y. Mar. 28, 2022).  "Circumstantial evidence can support an inference of scienter" where defendants "knew facts or had access to information suggesting that their public statements were not accurate."  Emps.' Ret. Sys. of Gov't of the Virgin Islands v. Blanford, 794 F.3d 297, 306 (2d Cir. 2015) (cleaned up). Negligence, by contrast, is the mere "failure to use reasonable care, which is the degree of care that a reasonably careful person would use under like circumstances."  SEC v. Cole, No. 12-cv-8167, 2015 WL 5737275, at *6 (S.D.N.Y. Sept. 19, 2015).

In Horowitz's view, because he did not have access to the raw data and because Medly's investigations never definitively connected the OCL imbalance to the fake prescriptions, he was not reckless or negligent in believing that the financial statements provided to investors were accurate.  The analyst's findings, he emphasizes, identified only "unspecified irregularities . . .

---

[2] Like with the money-and-property requirement, Horowitz contended in his opening brief that he did not make the revenue misstatements under Janus, but he later withdrew the argument after the amendment.

derived from unknown analyses and methodologies." Horowitz belabors that he was the one who initiated the investigations, which he posits defeats any inference of fraudulent intent.

This argument misunderstands the SEC's burden. It does not need to plead facts showing that Horowitz knew, as an absolute matter, that Medly's revenue was overstated, that he knew what caused the overstatement, or that he took no action to investigate the overstatement. It need only allege that, at the time Horowitz provided the investors with Medly's financials, he recklessly disregarded – or, for the § 17(a) claim, should have known – that the revenue figures were wrong. And plenty of the above-mentioned allegations support such an inference: the analyst's report, the accountant's report, and the OCL imbalance, to name a few. These facts might not conclusively settle that the revenue figures were wrong, but they "suggest[]" that the figures "were not accurate." Blanford, 794 F.3d at 306.

At multiple points throughout his briefing, Horowitz also seeks refuge in what he claims is a well-established principle that "[a] person cannot . . . recklessly make a false statement about an unknown fact." Because neither he nor anyone else knew about Bhatt's forgeries, he reasons, he could not have recklessly made a false statement about Medly's revenue. Although he gets points for originality, Horowitz's newly concocted axiom has no application here. The complaint contains abundant allegations indicating he knew that Medly's revenue was misstated, even if he didn't know the cause or extent.

And on top of that, the principle is patently wrong. Say you come home from work one day and notice smoke billowing up from the roof of your house. Instead of investigating, you drive off to the nearest golf course, call your spouse, and say, "I'm out golfing, but I stopped by the house on my way home, and everything looks fine." If it turns out your house was on fire,

then you recklessly made a false statement.  It does not matter whether you, or anyone else, knew about the fire.  What matters is that you had access to information making clear that your statements were at least misleading, if not untrue.

I am similarly unmoved by Horowitz's passing references to the heightened requirements contained in Rules 8 and 9 for pleading fraud.  He stresses that the scienter allegations are too attenuated to satisfy the high bar for fraud set by the rules.  Again, the pleaded facts give rise to a strong inference of scienter.  Horowitz also overlooks that "[a] complaint subject to Rule 9(b) should be allowed to survive a motion to dismiss based on fairly tenuous inferences of intent, because intent is a fact that a jury should find."  SEC v. Shapiro, No. 15-cv-7405, 2018 WL 2561020, at *4 (S.D.N.Y. June 4, 2018) (cleaned up).

Moreover, the cases from which Horowitz draws most of his ammunition involve private plaintiffs, for whom the standard for pleading scienter is not so lenient.  See, e.g., Novak v. Kasaks, 216 F.3d 300 (2d Cir. 2000).  Under the Private Securities Litigation Reform Act, which supplements Rule 9, such plaintiffs need to plead scienter with particularity, but that statute (as its name makes unmistakable) does not apply to the SEC.  SEC v. Dunn, 587 F. Supp. 2d 486, 500 (S.D.N.Y. 2008).  For the SEC, Rule 9 requires only that it "specifically connect the speakers and the misstatements," which Horowitz cannot dispute the SEC has done here.  SEC v. Farnsworth, 692 F. Supp. 3d 157, 192 (S.D.N.Y. 2023).

In addition to his scienter arguments, Horowitz advances a last-ditch assault on the materiality prong.  He submits that the misstated revenue could not have misled the sophisticated investors who received Medly's financials because the OCL imbalance would have tipped them off – indeed, it tipped off Investor C's diligence team.  His argument, however, does not target

10

materiality.  Medly's revenue is almost definitionally material to investors; Horowitz does not

seriously contest there is "a substantial likelihood that a reasonable shareholder would consider"

a ten-to-twenty-percent overstatement of revenue "important."  TSC Indus., Inc. v. Northway,

Inc., 426 U.S. 438, 449 (1976).  Rather, the argument speaks to reliance.  What Horowitz in fact

contends is that, due to the OCL imbalance, investors would not have *relied* on the revenue

figures in making their investment decision.  But the SEC, unlike a private securities-fraud

plaintiff, need not show reliance.  Lorenzo v. SEC, 587 U.S. 71, 84 (2019).  It therefore has

plausibly stated a misstatement claim against Horowitz.

## II.    Scheme Liability

The SEC's next batch of claims reside in the remote outer subsections of Rule 10b-5 and

§ 17(a).  These so-called "scheme liability" subsections cover the use of "any device, scheme, or

artifice to defraud" and "any act, practice, or course of business which operates or would operate

as a fraud or deceit upon any person."  17 C.F.R. § 240.10b-5(a), (c); 15 U.S.C. § 77q(a)(1), (3).

To plead a scheme-liability claim, a plaintiff must plausibly allege that the defendant "(1)

committed a deceptive or manipulative act; (2) in furtherance of the alleged scheme to defraud;

(3) with scienter."  SEC v. Sason, 433 F. Supp. 3d 496, 508-09 (S.D.N.Y. 2020) (quotations

omitted).

### A.  Bhatt

Like it does with the misstatement claim against Horowitz, the amended complaint sets

forth a textbook scheme-liability claim against Bhatt.  It neatly lays out how Bhatt's deceptive

conduct (the entry of false prescriptions) furthered a scheme to defraud (an effort to inflate

Medly's revenue), and it contains heaps of facts giving rise to a strong inference of scienter.

"[S]ham transactions" are a quintessential example of "inherently deceptive act[s] that [are] distinct from an alleged misstatement." Farnsworth, 692 F. Supp. 3d at 189-90. So too are "fabricated documents." SEC v. Collector's Coffee, Inc., 697 F. Supp. 3d 138 (S.D.N.Y. 2023), aff'd sub nom. SEC v. Kontilai, No. 23-7537, 2025 WL 615190 (2d Cir. Feb. 26, 2025). Bhatt's fake prescriptions fit both bills.  He attempts to casts the forgeries as "ordinary operational activities that only became potentially misleading when others incorporated them into financial statements and investor communications," which in his view, cannot be deceptive. But deceptive conduct need not be directed towards investors; it can be directed towards "any person," so long as investors are ultimately misled.  17 C.F.R. § 240.10b-5(c).  Courts often hold defendants liable for conduct that indirectly deceives investors by directly deceiving non-investors.  See, e.g., SEC v. DiMaria, 207 F. Supp. 343, 353, 355 (S.D.N.Y. 2016).

As for the "in furtherance" element, Bhatt points to several cases in which defendants were held liable under the scheme subsections for conduct more egregious, and more closely linked to the purchase and sale of securities, than his own.  See, e.g., Lorenzo, 587 U.S. at 71. Sure, Bhatt's conduct is more attenuated from investors than the conduct in the cases he cites. But what matters is whether the deceptive conduct and the fraud were part of a "string of events that [are] all intertwined." Romano v. Kazacos, 609 F.3d 512, 524 (2d Cir. 2010).  And that is the case here – Bhatt's deceptive conduct inflated Medly's revenue in financial statements that defrauded investors.

The amended complaint also contains facts strongly suggesting Bhatt acted with scienter. He worked closely with Horowitz, Patel, and Medly's internal accounting team to compile financial statements, which were "periodically shared" with Bhatt, and he "was included in"

discussions about "changes to Medly's processes for revenue recognition in its financial statements." From this, one can infer he knew the fake prescriptions would create a spike in revenue on Medly's financial statements. And one can further infer that he knew investors would rely on the statements: Emails to family members show that Bhatt was aware of Medly's efforts to solicit outside investors. In fact, Bhatt "was specifically asked to contribute to diligence responses for at least one of Medly's" investors who received the false financial reports.

One last point on the scheme-liability claims against Bhatt. Allowing them to go forward does not "effectively eliminate the distinction between primary violations and aiding and abetting that Congress carefully preserved," as Bhatt forewarns, because he was not merely "creating internal business records that others might later use in misleading investors." Bhatt modified key internal data knowing full well that it would artificially juice Medly's stated revenue and that Medly's executives would present the revenue statements to investors in its upcoming fundraising round. He accordingly committed fraud independent of any other defendant's violation. Even if Horowitz and Patel were reasonable in determining that Medly's stated revenue was accurate, Bhatt would have defrauded the investors.

### B. Horowitz

Conversely, the SEC oversteps by attempting to mold its allegations into a scheme-liability claim against Horowitz. It argues that Horowitz engaged in "deceptive conduct" by disseminating his own statements to investors as part of a scheme to fundraise for Medly, but this alleged conduct is not sufficiently distinct from his misstatements.

The Supreme Court and the Second Circuit have long wrestled with the interplay between the scheme liability subsections, their neighboring misstatement-and-omissions subsections, and the Acts' separate aiding-and-abetting prohibitions.  Both courts have been hesitant to demarcate boundaries between each theory of liability in ways that might muddle primary and secondary liability, on the one hand, or scheme and misstatement liability, on the other.  See, e.g., Central Bank of Denver, N. A. v. First Interstate Bank of Denver, N. A., 511 U.S. 164 (1994).  Relevant here, the Second Circuit has clarified that "alleged misrepresentations or omissions" cannot form the "sole basis" for scheme liability; otherwise, the outer scheme subsections would render the inner misstatement subsections superfluous.  Lentell v. Merrill Lynch & Co., 396 F.3d 161, 171 (2d Cir. 2005)).

This holding was briefly called into question by Lorenzo, 587 U.S. at 71, an intervening Supreme Court decision.  There, the Supreme Court ruled that the SEC could hold a defendant liable under the scheme subsections of Rule 10b-5 for emailing to a client a false statement made by his employer.  "Dissemination," it reasoned, fell within the "wide range of conduct" captured by the terms "device," "scheme," and "artifice to defraud."  Id.

Yet the Second Circuit nevertheless adhered to Lentell.  In Rio Tinto, 41 F.4th at 48, the SEC appealed a district court's dismissal of scheme-liability claims premised on what the district court characterized as "misstatements and omissions only."  The panel rejected the SEC's argument that Lorenzo abrogated Lentell.  It held that the two opinions are consistent because disseminating another's misstatement, which Lorenzo said can support a scheme-liability claim, is "something beyond" the misstatement itself, which Lentell said was a prerequisite for scheme liability. Id.  It also identified several reasons why "Lorenzo preserved the lines between the

14

subsections" drawn in <u>Lentell</u>.  <u>Id.</u>  For one, the panel recognized that keeping some distinctions between the subsections comports with the heightened pleading requirements imposed by the PSLRA, which applies to 10b-5(b) but not (a) or (c).  If a bare misstatement can create scheme liability, then private plaintiffs can avoid the PSLRA entirely by recasting their misstatement claims as scheme claims.  <u>See, e.g.</u>, <u>In re Alstom SA</u>, 406 F. Supp. 2d 433, 475 (S.D.N.Y. 2005).

The claim against Horowitz raises a question seemingly left unanswered by <u>Rio Tinto</u>: can the act of sending *one's own* false statements to others form the sole basis for scheme liability?  The SEC and some district courts say yes.  <u>See, e.g</u>, <u>SEC v. Amah</u>, No. 21-cv-6694, 2023 WL 6386956, *14 (S.D.N.Y. 2023) (holding a defendant liable under the scheme subsections for "directly disseminating" his own misstatements).  Horowitz and other district courts say no.  <u>See, e.g.</u>, <u>In re Carlotz, Inc. Sec. Litig.</u>, No. 21-cv-5906, 2024 WL 3924708 (S.D.N.Y. Aug. 23, 2024) ("[D]issemination . . . . does not include sending one's own false statements to prospective investors.").

For there to be any distinction between the misstatement and scheme-liability subsections, as the Second Circuit says there is, relaying to investors your own misstatement cannot be "something beyond" the misstatement.  <u>Rio Tinto</u>, 41 F.4th at 48.  Characterizing that communication as "dissemination" distinct from the statement itself is nonsensical and runs contrary to the Supreme Court's understanding of what it means to make a statement.  A "statement" is a "written or oral communication setting forth facts, arguments, demands, or the like." 7 <u>Oxford English Dictionary</u>, 857 (1933).  A person "makes" a statement when they enjoy "ultimate authority over the statement, including its content and whether and how to communicate it."  <u>Janus</u>, 564 U.S. at 142.  It follows that "disseminating" one's own

misstatement is equivalent to "making" a misstatement: the disseminator communicates false information over which he has full control and authority.

To see why this must be, compare the facts here to the facts in <u>Lorenzo</u>. The email in <u>Lorenzo</u> was a misstatement. It communicated false information to investors. But the defendant did not make that misstatement under <u>Janus</u> because he "sent the e-mails at the direction of his boss, who supplied the content and 'approved' the messages." <u>Lorenzo</u>, 587 U.S. at 75. In other words, because the defendant had no control over the misleading content, his act of sending the email was "something other" than a misstatement. Horowitz, by contrast, had full authority over his communications with Medly's prospective investors, from the subject line of his emails to the attached financial statements. His "dissemination" of the financial statements was therefore itself a misstatement and cannot independently undergird a scheme-liability claim. <u>See</u> <u>Lentell</u>, 396 F.3d at 171.

Moreover, the SEC's preferred interpretation would create the precise problems that <u>Rio Tinto</u> sought to avoid. If private plaintiffs bringing a misstatement claim wanted to avoid the strictures of the PSLRA, they could simply focus their complaint on the defendant's "dissemination" of his misstatement, rather than the misstatement itself. Then, *voila*, they would plead a scheme-liability claim free and clear of the PSLRA.

Admittedly, <u>Lorenzo</u> sends out mixed signals on the bounds of Rule 10b-5's subsections. Some language in the opinion suggests that the misstatement subsection may be no more than a subset of the scheme subsections. For instance, the Court noted that "[e]ach succeeding prohibition" in Rule 10b-5 was "meant to cover additional kinds of illegalities – not to narrow the reach of the prior sections." <u>Lorenzo</u>, 587 U.S. at 80. Some language suggests the opposite.

16

For instance, the Court was careful to explain that its holding would not "render [its] decision in Janus . . . 'a dead letter.'" Id. at 54. It "assume[d] that Janus would remain relevant (and preclude liability) where an individual neither makes nor disseminates false information – provided, of course, that the individual is not involved in some other form of fraud." Id.

But all this does not matter for our purposes because how to read Lorenzo is an answered question. The Second Circuit concluded, and reaffirmed, that the scheme subsections require *something* beyond a misstatement, and there is no way to square the SEC's theory here with that rule. The amended complaint does not accuse Horowitz of falsifying the sales, of orchestrating sham transactions, or of employing any "device, scheme, or artifice to defraud." 17 C.F.R. § 240.10b-5(a); 15 U.S.C. § 77q(a)(1). It accuses him of making statements about Medly's revenue in the face of overwhelming evidence that those statements were false.[3] Those are misstatements, and only misstatements, which cannot alone support scheme liability.

## III.    Aiding-and-Abetting Liability

The final claim targeted by the motions seeks to hold Bhatt secondarily liable for aiding and abetting Patel and Horowitz's violations. Section 20(e) Exchange Act and Section 15(b) of the Securities Act enables "the SEC, but not private litigants, to bring civil actions against aiders and abettors of securities fraud." SEC v. Apuzzo, 689 F.3d 204, 211 (2d Cir. 2012) (citing 15 U.S.C. § 78t(e)); see also 15 U.S.C. § 77o(b) (codifying § 15(b) of the Securities Act). Under either section, the SEC must allege (1) "the existence of a securities law violation by the primary

---

[3] The SEC alternatively contends that the amended complaint sets forth other deceptive conduct in addition to the dissemination, but its conclusory argument does not convince. All the conduct it highlights falls either outside the definition of "deceptive conduct" (for example, "leading strategy sessions for fundraising . . . while he knew Medly's financials were inaccurate") or inside the definition of "misstatement or omission" (for example, "hid[ing] . . . conflicting liabilities . . . from Medly's Board").

(as opposed to the aiding and abetting) party"; (2) that the aider and abettor acted knowingly or recklessly; and (3) "'substantial assistance' by the aider and abettor in the achievement of the primary violation."[4]  Id.  As discussed above, the SEC has alleged at least one primary securities-law violation: Horowitz's misstatements to investors.  Whether Bhatt aided and abetted that violation, then, turns on substantial assistance and recklessness. [5]

Conveniently, those two elements "are to be considered in tandem, as a high degree of knowledge may lessen the SEC's burden in proving substantial assistance, just as a high degree of substantial assistance may lessen the SEC's burden in proving scienter."  SEC v. Rogas, No. 20-cv-7628, 2024 WL 1120558, at *6 (S.D.N.Y. Mar. 14, 2024) (cleaned up).  To plead substantial assistance, the SEC must allege that a defendant "in some sort associated himself with the [violation], that he participated in it as something that he wished to bring about, and that he sought by his action to make it succeed.'"  United States v. Peoni, 100 F.2d 401, 402 (2d Cir. 1938) (L. Hand, J.).  It need not show that the defendant proximately "caused the harm on which the primary violation was predicated."  SEC v. Wey, 246 F. Supp. 3d 894, 927 (S.D.N.Y. 2017).  As for the mental-state element, the SEC must set forth facts that, "read as a whole," show the defendant knew or was reckless in not knowing "parts of the scheme" and "his role within it."  Id. at 932.

---

[4] Citing decades-old cases, Bhatt argues that the SEC must plead actual knowledge of the violation.  See, e.g., Renner v. Chase Manhattan Bank, No. 98-cv-926, 2000 WL 781081, at *12 (S.D.N.Y. June 16, 2000).  The actual knowledge requirement applied in those cases, however, was loosened by the Dodd Frank Act, which "amended Section[s] 20(e) [and 15(b)] to add the words 'or recklessly' after 'knowingly.'"  Apuzzo, 689 F.3d at 211 n.6.

[5] Of course, Bhatt might also be liable for aiding and abetting Patel.  But because the SEC states a claim that he aided and abetted Horowitz, I need not reach that question.

The amended complaint's allegations of substantial assistance abound.  Whether or not Patel and Horowitz in fact knew it, Bhatt's fake sales were essential to their misstatements.  They demonstrate both an "association" with Horowitz's false statements and a "desire" to misstate Medly's revenue.  Peoni, 100 F.2d at 402.

The recklessness allegations are comparatively weaker, but they are buoyed by the strength of the assistance allegations.  See Rogas, 2024 WL 1120558, at *6.  And they are not so weak that the claim should be dismissed.  By the SEC account, Bhatt knew the company was conducting a round of fundraising, he knew how Medly's internal auditing and financial-analysis systems operated, and he knew that Horowitz ultimately controlled Medly's financial statements.  From those facts, one could plausibly infer that Bhatt knew that his false prescriptions would have been raised to Horowitz, and that Horowitz would be hesitant to restate Medly's financials so soon before fundraising.  In doctrinal terms, even if he did not know about each of the misstatements, he was at least reckless in not knowing that Horowitz was inclined to present the revenue to investors.

Bhatt is wrong that the SEC's theory "improperly collapses the distinction between primary violations and aiding and abetting."  As the Supreme Court has long recognized, "it is hardly unusual for the same conduct to be a primary violation with respect to one offense and aiding and abetting with respect to another."  Lorenzo, 587 U.S. at 83.  Like how "John, for example, might sell Bill an unregistered firearm in order to help Bill rob a bank, under circumstances that make him primarily liable for the gun sale and secondarily liable for the bank robbery," id., Bhatt created false prescriptions that make him primarily liable for scheming to defraud investors and secondarily liable for the false statements made by Horowitz.

19

### IV.    Motion to Stay

One issue remains: Bhatt's alternative request to stay the case "pending resolution of the ongoing criminal investigation."  He argues that allowing this case to proceed while the Department of Justice investigates criminal charges presents him with a "'Hobson's choice' between defending himself in this action and preserving his Fifth Amendment rights in the criminal case."

When determining whether to stay a civil case based on parallel criminal proceedings, courts consider six factors:

> 1) the extent to which the issues in the criminal case overlap with those presented in the civil case; 2) the status of the case, including whether the defendants have been indicted; 3) the private interests of the plaintiffs in proceeding expeditiously weighed against the prejudice to plaintiffs caused by the delay; 4) the private interests of and burden on the defendants; 5) the interests of the courts; and 6) the public interest.

Louis Vuitton Malletier S.A. v. LY USA, Inc., 676 F.3d 83, 99 (2d Cir. 2012).  The second of these factors has special importance.  "Generally, courts in this Circuit have denied requests for a stay where, as here, the defendant has not yet been indicted."  SEC v. Santillo, No. 18-cv-5491, 2018 WL 6039324, at *2 (S.D.N.Y. Nov. 2, 2018) (collecting cases).

In line with general practice within this circuit, the Court will not indefinitely pause this litigation while the DOJ decides whether to prosecute defendants.  It is true that the issues in a hypothetical criminal action would unavoidably overlap with the issues before the Court and that Bhatt may be presented with what he terms a "Hobson's choice," but those considerations are present in every civil case with a parallel criminal investigation.  Bhatt does not raise any unique circumstances that would outweigh the SEC's, the public's, and the Court's joint interest in an

20

expeditious litigation.  Cf. SEC v. Constantin, No. 11-cv-4642, 2012 WL 1195700, at *2 (S.D.N.Y. Apr. 9, 2012) (denying a stay because the defendant gave "no indication that anything about his particular situation is more pointed or difficult than in any other case of parallel proceedings" (cleaned up)).  And Bhatt seemingly realizes this; his reply brief does not respond to the SEC's arguments opposing a stay.

## CONCLUSION

For these reasons, Horowitz's motion is granted as to the scheme-liability claims but otherwise denied, and Bhatt's motion is denied.


**SO ORDERED.**

_Brian M. Cogan_
_____
U.S.D.J.


Dated: Brooklyn, New York
      July 16, 2025